**Reta J. BEST, Plaintiff,**

v.

**NISSAN MOTOR CORPORATION, et al., Defendant.**

**No. 3–97–0499.**

United States District Court,
M.D. Tennessee,
Nashville Division.

July 31, 1997.

---

William Kennerly Burger, Murfreesboro, TN, for Plaintiff.

Paige Waldrop Mills, Carl I. Jacobson, Nashville, TN, for Defendant.

## MEMORANDUM

### I. *Introduction*

CAMPBELL, District Judge.

Pending before the Court is Defendants' Motion For Summary Judgment (Docket No. 6). For the reasons stated below, Defendants' Motion is GRANTED, and this action is dismissed.

### II. *Factual and Procedural Background*

Plaintiff filed this action in Rutherford County Circuit Court seeking accrued disability benefits under a group health insurance plan, "Group Life and Accident and Health Insurance Policy," administered by Defendant Aetna Life Insurance Company ("Aetna"). Plaintiff based her claim on the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.* Defendants subsequently removed the action to federal court. (Docket No. 1).

The statements of undisputed material facts and responses filed by the parties, as well as the administrative record that has been filed by Defendants, reveal the following undisputed facts. Plaintiff began her employment with Distribution and Auto Service, Inc., a subsidiary of Nissan, on October 12, 1994. She worked as a "Driver-night," and her duties consisted of driving and parking vehicles between the plant and its parking lots.

Plaintiff was born on April 16, 1962. When she was 17 or 18 years old, she fell down some stairs and hurt her back. She has had intermittent back problems since that time.

During her employment with Nissan, Plaintiff became pregnant. According to the Defendants, she ceased working on July 18, 1995, claiming her "pregnancy with back pain" caused her to be unable to work. Plaintiff contends that she was unable to work because of the "intense heat," which complicated her pregnancy and caused fainting spells.

Plaintiff gave birth on January 11, 1996, and filed a long-term disability claim notice on January 19, 1996. She stated in the notice that she expected to return to work on March 1, 1996. (Appendix To Defendants' Motion For Summary Judgment (Docket No. 10), at A00001). Plaintiff filed, in support of her long-term disability claim, an Attending Physician's Statement prepared on January 26, 1996, by Dr. M. Bruce Hirsch, Plaintiff's OB–GYN specialist. Dr. Hirsch opined that Plaintiff's prognosis was good, that she would reach maximum medical improvement in one to three months. Dr. Hirsch estimated her return to work date as February 26, 1996. (Appendix, at A00008–A00009).

Aetna then began investigating Plaintiff's long-term disability claim. During that process, Aetna received a Physical Assessment from Dr. Melvin D. Law, Jr., Plaintiff's orthopedic specialist, dated April 16, 1996. Dr. Law opined that Plaintiff suffered from "severe degenerative disk disease of L-spine with vertical instability," and that Plaintiff could not bend, squat, crawl, climb, twist, walk on rough ground, nor carry or lift more than ten pounds. (Appendix, at A00058).

As part of its investigation, Aetna also received an MRI–Lumbar Spine Report dated April 26, 1995, which reflected a "mild central bulging of the L–5/S–1 disk, otherwise unremarkable." (Appendix, at A00035).

Despite the contradiction between Dr. Hirsch's opinion and the 1994 MRI Report on the one hand, and Dr. Law's assessment on the other, Aetna approved Plaintiff's long-term disability claim, with plans to request an independent medical examination to verify her alleged disability. Aetna notified Plaintiff of the approval of long-term disability benefits by letter dated April 30, 1996, and paid Plaintiff her benefits from the date of her application. (Appendix, at A00062).

By letter dated May 29, 1996, Aetna informed Plaintiff that it had scheduled an independent medical examination to be conducted by Dr. Robert E. Clendenin, III, at 10:30 a.m. on June 11, 1996. Plaintiff was instructed to bring to the examination all medical records, x-rays and test results to assist in the exam. On June 11, 1996, Plaintiff was thirty minutes late for her appointment and failed to bring her x-rays with her. No exam was performed. Plaintiff maintains that she was late for the appointment because Defendants gave her an incorrect address for Dr. Clendenin.

By letter dated June 14, 1996, Aetna informed Plaintiff that it had scheduled another independent medical exam to be conducted by Dr. Lawrence Laughlin, at 8:30 a.m. on July 1, 1996.

On July 1, 1996, Dr. Laughlin performed an independent medical examination of Plaintiff. Dr. Laughlin examined the Plaintiff, and reviewed x-ray films and the April 26, 1995 MRI Report brought by the Plaintiff. Dr. Laughlin found that the x-ray films "show very minimal narrowing of L–5/S–1," and that the April 26, 1995 MRI "shows a bulge at S–I, but on the axial view, there are no significant compression of the nerve roots." (Appendix, at A00078–A00079). Dr. Laughlin concluded:

> She really has very minimal degenerative disk disease. I don't think she is a surgical candidate. She is certainly in poor physical condition and grossly overweight. I see no problems which would keep her from working in any form or fashion that she did before she was injured. She looks like she has had a back strain. I recommend that she loose [sic] weight and improve her physical condition. She can do home exercises.

(*Id.*) Dr. Laughlin also prepared a Physical Assessment for a Job Placement, which states that Plaintiff had no limitations and no restrictions. (Appendix, at A00080).

By letter dated July 2, 1996, Aetna informed Plaintiff that it was terminating her long-term disability benefits effective July 31, 1996. (Appendix, at A00071–A00072). Plaintiff was informed of her right to request reconsideration of the determination and her right to review all documents pertinent to her claim. (*Id.*)

Plaintiff then sent Aetna a letter requesting a copy of Dr. Laughlin's report. By letter dated August 6, 1996, Aetna sent Plaintiff a copy of Dr. Laughlin's report.

By letter dated August 12, 1996, Dr. Law, Plaintiff's orthopedic specialist, wrote to Aetna, stating that he completely disagreed with Dr. Laughlin's assessment. (Appendix, at A00083–A00090). He stated that Plaintiff had a "textbook case of severe disk disease at L–5/S–1 with severe verticle [sic] instability at L–5/S–1," and that Plaintiff was probably a "surgical candidate for this problem." (*Id.*) Aetna considered this letter a request for reconsideration. (*Id.*)

In response to Dr. Law's correspondence, Aetna asked that its in-house disability claims medical consultant, Dr. Len Kemler, review the medical information. After reviewing the file, Dr. Kemler prepared a report, dated September 6, 1996, which contained the following comments:

> The claimant has had back pain for 17 yrs. During that time, she has been able to maintain full-time employment. She became pregnant in July 1995, + this aggravated her back pain. Pregnancy is known to do this. The clmt. has delivered +, back pain has abated, but clmt. still claims disability. Dr. Law states that the clmt. has severe disk disease L–5/S–1. The MRI of Apr. 1995 shows only mild central bulging L–5, S–1. Dr. Law states, in a letter dated 2/26/96, that clmt. does heavy labor, but can do only light labor. In fact her job is light labor.
>
> Dr. Laughlin, a board-certified orthopedic surgeon, in an IME dated 7/01/96, could find no physical evidence of disease and felt that claimant could [return to work] own [occupation] with no restrictions.
>
> In order to resolve these conflicting views, I feel we should get a new MRI of lumbar spine, + then an IME with another board-

certified orthopedic surgeon, with special reference to [return to work].

(Appendix, at A00092–A00093).

In response to Dr. Kemler's suggestion, by letter dated September 24, 1996, Aetna informed Plaintiff that it had scheduled a second independent medical examination to be conducted by Dr. Dan M. Spengler, the Chairman of the Vanderbilt University Medical Center's Orthopedics and Rehabilitation Department, at 9:15 a.m. on October 15, 1996. Aetna also scheduled Plaintiff for a second lumbar spine MRI.

Upon completion of the independent medical examination, and pending receipt of the second MRI, Dr. Spengler, on October 15, 1996, prepared an interim report to Aetna. (Appendix, at A00097–A00098). That report states, in part:

> Her physical examination revealed an overweight lady in no acute distress. Her range of motion of her spine was limited with minimal dysthymia. In my opinion she had three of five inappropriate physical findings described by Gordon Waddell as being positive. She had inappropriate tenderness, discrepancy between recumbent and supine straight leg raising, and inappropriate sensory exam. She also moved about rather well in the examining room, but had difficulty with motion of her spine when I actually examining [sic] her. . . .
>
> Basically we have a fairly young lady who has significant symptoms without much in the way of objective findings. . . . I also would have a hard time recommending significant disability since I can identify no objective malady that affects her musculoskeletal system.

(*Id.*)

Plaintiff underwent a second lumbar spine MRI on November 15, 1996, which revealed:

> There is a degenerative change in the bone marrow adjacent to the L–5/S–1 disk. There is moderate disk space narrowing at L–5/S1. The alignment is normal. There is diminished signal arising from the L–5/S–1 disk. The disks demonstrate normal height and hydration. The conus medul-

laris is normal in position and configuration. The facet joints are within normal limits. There is no neural foramen or spinal canal stenosis. There is no disk herniation or significant bulge of the disks.

IMPRESSION:

DEGENERATIVE DISC DISEASE L5–81. NO EVIDENCE OF LUMBAR DISC HERNIATION OR LUMBAR SPINAL CANAL OR NEURAL FORAMEN STENOSIS.

(Appendix, at A00099).

On November 27, 1996, Dr. Spengler, having reviewed the second MRI, provided a supplemental report to Aetna. That report states in part:

> I had recently written you on October 15, 1996, regarding Reta Best. I have subsequently reviewed her MRI, which was obtained November 15, 1996. My interpretation, and the interpretation of the radiologist, is that there were no significant pathological findings on this study. I would agree with my summary in the first letter that I find no evidence of any significant disability involving the musculoskeletal system in this particular patient. I would, therefore, not recommend any permanent-partial impairment rating, since this would equal 0 percent.

(Appendix, at A00100).

By letter dated December 10, 1996, Aetna informed Plaintiff that it had denied her request for reconsideration, and that its original decision to terminate Plaintiff's long-term disability benefits would stand. (Appendix, at A00101).

### III. *Analysis*

#### A. *The Standards for Considering Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In order to prevail, the movant has the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether the movant has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–88, 106 S.Ct., 1348, 1356, 89 L.Ed.2d 538 (1986).

In order to defeat the motion, the nonmoving party is required to show, after an adequate time for discovery, that there is a genuine issue of fact as to every essential element of that party's case upon which he will bear the burden of proof at trial. *Celotex Corp.,* 477 U.S. at 323–25, 106 S.Ct. at 2553. In order to create a genuine factual issue, the nonmoving party must show "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Although the nonmovant need not show that the disputed issue should be resolved in his favor, he must demonstrate that there are genuine factual issues that "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.*

A preponderance of the evidence standard is used in this determination. *Id.* Therefore, if the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," the motion for summary judgment may be granted. *Id. See also Matsushita Electric,* 475 U.S. at 586–88, 106 S.Ct. at 1356.

#### B. *The Appropriate Parties*

Plaintiff challenges Defendants' denial of disability benefits based on 29 U.S.C. § 1132(a)(1)(B), which provides that "a participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

Defendant Nissan, Plaintiff's employer, argues that it is not a proper defendant in this

action because it does control administration of the plan. Plaintiff has not responded to this argument.

The Sixth Circuit has held that an employer that established an employee benefit plan is not a proper party defendant in an ERISA action to recover benefits under the plan unless the employer is shown to control administration of the plan. *Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir.1988). *See also International Union v. Auto Glass Employees Fed. Credit Union*, 858 F.Supp. 711, 722–23 (M.D.Tenn.1994), *aff'd* 72 F.3d 1243 (6th Cir.1996).

■ The Plan in this case provides that Aetna is responsible for administering the plan, and names Aetna as a fiduciary under the Plan. (Appendix, at B00011). Plaintiff has presented no evidence indicating that Nissan controls administration of the Plan. Under these circumstances, the Court concludes that Nissan is not a proper defendant to this action and should be dismissed.

### C. *Standard of Review*

Defendants argue that the decision to deny Plaintiff disability benefits should be reviewed using an arbitrary and capricious standard of review. Plaintiff argues, on the other hand, that the decision should be subjected to a heightened standard of review because Defendant Aetna operated under a conflict of interest when it made its decision.

ERISA does not set out the appropriate standard of review in actions challenging benefit determinations. In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113–15, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989), the Supreme Court held that a denial of benefits challenged under Section 1132(a)(1)(B) of ERISA is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. The Court went on to explain that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' " 489 U.S. at

115, 109 S.Ct. at 957 (quoting Restatement (Second) of Trusts § 187, Comment *d* (1959)).

The Plan provides that:

For the purpose of section 503 of Title I of the Employee Retirement Income Security Act of 1974, as amended (ERISA), Aetna is a fiduciary with complete authority to review all denied claims for benefits under this policy. This includes, but is not limited to, the denial of certification of the medical necessity of hospital or medical treatment. In exercising such fiduciary responsibility, Aetna shall have discretionary authority to:

> determine whether and to what extent employees and beneficiaries are entitled to benefits; and
>
> construe any disputed or doubtful terms of this policy.

Aetna shall be deemed to have properly exercised such authority unless Aetna abuses its discretion by acting arbitrarily and capriciously.

(Appendix, at B00011).

■ This language meets the requirements set forth in *Bruch* for application of an arbitrary and capricious standard of review. Indeed, Plaintiff does not dispute that these provisions give Aetna discretionary authority to determine entitlement to benefits. Instead, Plaintiff argues that because Aetna operated under a conflict of interest when it denied Plaintiff benefits, its decision should be reviewed under a heightened arbitrary and capricious standard.

■ The conflict of interest described by Plaintiff is that Aetna as the decision maker in determining whether benefits are to be paid out under the Plan would have a natural reluctance to grant requests for benefits because those benefits would be paid out of its own assets. The federal courts have recognized that this situation presents a genuine conflict of interest for the decision maker. *See, e.g., Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir.1995); *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 984–86 (6th Cir.1991). Therefore, the Court agrees with the Plaintiff that Aetna made its decision while operating under a conflict of interest.

As noted above, the Supreme Court in *Bruch* addressed the conflict of interest issue by stating that conflicts of interest must be weighed as a "factor in determining whether there is an abuse of discretion." 489 U.S. at 115, 109 S.Ct. at 957. In applying this statement, the federal courts have not adopted a uniform approach.

For example, the approach taken by the Eleventh Circuit, and that urged by the Plaintiff here, utilizes a "shifting burden" analysis. *Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1566–68 (11th Cir.1990). Under this approach:

> [w]hen a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self interest. That is, a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries.

898 F.2d at 1566–67 (footnote omitted). *See also Godfrey v. BellSouth Telecommunications, Inc.*, 89 F.3d 755, 757–59 (11th Cir. 1996).

The Ninth Circuit has employed a slightly different version of the shifting burden approach. Under this approach, the court applies the traditional abuse of discretion standard in conflict of interest cases, unless the affected beneficiary provides probative evidence that the "fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary." *Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1322–23 (9th Cir.1995). If the beneficiary makes the required showing, the plan bears the burden of showing that the conflict of interest did not affect the decision to deny benefits. *Id.* If the plan is unable to do so, its decision is reviewed under a *de novo* standard. *Id.*

By contrast, several circuit courts use a sliding scale approach by which the court applies an arbitrary and capricious standard of review, but decreases the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict. *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 826–27 (10th Cir. 1996); *Bernstein*, 70 F.3d at 788; *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 599 (5th Cir.1994). *See also Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251, 1255–56 (2nd Cir.1996) (court applies *de novo* review if administrator is shown to have been influenced by conflict of interest).

Although the Sixth Circuit has cited the Eleventh Circuit's decision in *Brown* in explaining how a conflict of interest may arise, *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d at 984, most of the cases in which the court has addressed the issue consider the administrator's conflict of interest as merely a factor to be considered in reviewing the administrator's decision. *Parker v. Metropolitan Life Ins. Co.*, 99 F.3d 181, 185 (6th Cir.1996); *Cairns v. Bridgestone/Firestone, Inc.*, 995 F.2d 1066 (Table), 1993 WL 204237, at \*\*2 n. 3 (6th Cir.1993); *Callahan v. Rouge Steel Co.*, 941 F.2d 456, 459 (6th Cir.1991); *Varhola v. Cyclops Corp.*, 914 F.2d 259, (Table), 1990 WL 126412, at \*5 (6th Cir.1990); *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 694 (6th Cir.1989).

Based on these Sixth Circuit decisions, the Court finds that it must consider Aetna's conflict of interest as a factor in reviewing Aetna's decision to deny benefits under an arbitrary and capricious standard.

D. *Review of Aetna's Decision To Deny Benefits*

The Court starts its review by identifying the Plan provisions that apply in this case. The Plan distinguishes between exempt employees and non-exempt employees in conferring entitlement to disability benefits. The record indicates that Plaintiff was an exempt employee. For exempt employees, the Plan provides that an employee is deemed to be disabled if:

● In the first 24 months of Long Term Disability Benefit payments

You are not able, solely because of injury or disease, to perform the material duties of your own occupation; except that if you start work at a reasonable occupation you will no longer be deemed totally disabled.

(Appendix, at B00034). In order to obtain benefits after the first 24 months, the employee must show he or she is unable to work at any reasonable occupation.

The Plan provides that the period of total disability ends on the date the employee is no longer totally disabled, or the date the employee fails to provide proof that he or she is totally disabled. (Appendix, at B00035).

Plaintiff's claim was made under the "first 24 months" provision, and therefore, she was required to show that she could not perform the material duties of her own occupation.

■ In applying the arbitrary and capricious standard, the Sixth Circuit has stated: " 'When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.' " *Davis,* 887 F.2d at 693. Based on a review of the administrative record filed by Defendants, the Court concludes that it was reasonable for Aetna to terminate Plaintiff's disability benefits, even after fully considering Aetna's conflict of interest, because Plaintiff could no longer provide sufficient proof that she was unable to perform the material duties of her own occupation.

The record indicates that Aetna relied on the opinions of two different independent orthopedic specialists in determining that Plaintiff was not disabled under the Plan. The first specialist, Dr. Laughlin, opined: "I see no problems which could keep her from working in any form or fashion that she did before she was injured." (Appendix, at A00079).

The second specialist, Dr. Spengler, opined that:

Basically we have a fairly young lady who has significant symptoms without much in the way of objective findings.... I also would have a hard time recommending significant disability since I can identify no objective malady that affects her musculoskeletal system.

(Appendix, at A00097–A00098).

After he reviewed the second MRI, Dr. Spengler confirmed this opinion:

I would agree with my summary in the first letter that I find no evidence of any significant disability involving the musculoskeletal system in this particular patient. I would, therefore, not recommend any permanent-partial impairment rating, since this would equal 0 percent.

(Appendix, at A00100). The Court notes that both experts relied on MRI tests in reaching their opinions.

■ Plaintiff argues that Aetna should have based its decision on the opinion of Plaintiff's treating orthopedist, Dr. Law, because Dr. Law saw the Plaintiff on a regular basis for over a year. But choosing to rely on the consistent opinions of two orthopedic specialists over a third contrary opinion does not render Aetna's decision arbitrary or capricious. *See Taft v. The Equitable Life Assurance Soc.,* 9 F.3d 1469, 1473–74 (9th Cir.1993) ("In the ERISA context, even decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion"); *Sandoval v. Aetna Life and Casualty Ins.,* 967 F.2d 377, 382 (10th Cir. 1992).

Plaintiff also argues that Aetna's decision was arbitrary and capricious because one of the MRI reports states that it shows "degenerative disc disease." The MRI Report referred to by Plaintiff was taken on November 15, 1996, and states, under "Impression:"

DEGENERATIVE DISC DISEASE L5–S1. NO EVIDENCE OF LUMBAR DISC HERNIATION OR LUMBAR SPINAL CANAL OR NEURAL FORAMEN STENOSIS.

(Appendix, at A00099).

This Report does not state that Plaintiff is disabled. It simply states that Plaintiff has degenerative disc disease. Plaintiff has not shown that degenerative disc disease automatically renders her unable to work. Indeed, after reviewing this MRI, Dr. Spengler stated that it showed "no evidence of any

significant disability." (Appendix, at A00100).

■ As for Aetna's conflict of interest, the Court finds no evidence indicating that Aetna's financial self-interest improperly influenced its decision to deny benefits. The weight given to such conflicts is diminished when the insurer/fiduciary relies on truly independent medical consultants in making its decision, as Aetna did in this case. *See Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 n. 3 (7th Cir.1994).

This is not to find that an insurer/fiduciary's incentive to maximize profits by denying meritorious claims can never outweigh an independent medical evaluation. Nor is it to find that all third-party medical evaluations are truly independent. These concerns, however, are not applicable to the facts of this case.

### IV. *Conclusion*

In conclusion, the Court holds that Aetna's decision to deny disability benefits to Plaintiff was not arbitrary and capricious. Accordingly, Defendant's Motion for Summary Judgment is granted, and this case is dismissed.

It is so ORDERED.