Lynne VOIGHT, Plaintiff,

v.

**METROPOLITAN LIFE INSURANCE CO., Defendant.**

No. 98–2588 MMM (CTX).

United States District Court, C.D. California.

Oct. 15, 1998.

Stanton T. Mathews, Stanton T. Mathews Law Offices, Laguna Hills, CA, for Lynne Voight.

Robert M. Mitchell, Lawrence E. Butler, Thomas R. Kaufman, Seyfarth Shaw Fairweather & Geraldson, Los Angeles, CA, Amy Fisch Solomon, Girardi & Keese, Los Angeles, CA, for Metropolitan Life Ins. Co.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MORROW, District Judge.

Plaintiff Lynne Voight filed this action under the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B) ("ERISA") against defendant Metropolitan Life Insurance Company ("MetLife") for wrongful denial of long term disability benefits. MetLife's motion for summary judgment came on regularly for hearing on October 5, 1998. Having carefully considered the papers submitted and the oral argument of counsel, the court grants MetLife's motion.

## I.

### STATEMENT OF FACTS

The following facts are undisputed.

Lynne Voight was employed by First Federal Savings Bank (the "Bank") from December 1990 to April 1995 as a Full Service Specialist. In this position, she provided customer service and handled administrative responsibilities. (Defendant's Statement of Uncontroverted Facts ("Def.'s Fact") 1.) On January 11, 1995, Voight took a medical leave of absence to undergo trans-nasal brain surgery. The surgeon removed a pituitary tumor that had been secreting a growth hormone into Voight's bloodstream, resulting in a hormonal imbalance called acromegaly. (Def.'s Fact 8.) The procedure was successful, and she returned to work on March 9. (Def.'s Fact 11.) On April 20, 1995, Voight again took a medical leave. (Def.'s Fact 12;

Declaration of Laura Sullivan ("Def.'s Ex."), Ex. E.) After exhausting the maximum leave time available under Bank policy, Voight's employment was terminated on May 5, 1995. (Def.'s Ex. D.) On June 28, 1995, Voight applied to MetLife for long term disability benefits under the Bank's employee welfare benefit plan. (Def.'s Ex. E.)

The Bank and MetLife are both fiduciaries under the Plan, and have the following responsibilities: MetLife is responsible for the "[p]rovision of full and fair review of claim denials pursuant to Section 503 of ERISA," and the Bank is charged with all remaining administrative responsibilities. (Def.'s Ex. C.) In carrying out its responsibilities under the Plan, MetLife

"shall have discretionary authority to interpret the terms of the plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation was arbitrary and capricious." (Def.'s Ex. C.)

The Plan provides that disability benefits will be paid upon MetLife's receipt of "proof" that a Plan participant is totally disabled. (Def.'s Ex. B. at 13.) Total disability is defined as follows:

"Total Disability or Totally Disabled means that, due to an Injury or Sickness, you:

1. are completely and continuously unable to perform each of the material duties of your regular job; and

2. require the regular care and attendance of a Doctor.

However, after the first 24 months of benefit payments, you must also be completely and continuously unable to perform the duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience, and past earnings.

You will also be considered Totally Disabled when, due to an Injury or Sickness, you suffer a 50% loss of earnings capacity and require the regular attendance of a Doctor." (Def.'s Ex. B at 12.)

According to an Attending Physician's Statement of Functional Capacity completed by Dr. Michael Truong, an internal medicine specialist, on July 8, 1995, Voight suffered from acromegaly as well as fatigue, headaches, and hypersomnia at the time she applied for disability benefits. (Def.'s Ex. E at 56.) Dr. Truong stated that Voight was moderately or severely restricted in her ability to climb, balance, push, pull, operate heavy equipment, and concentrate visual attention, with some limitation on her ability to walk, stand, sit, reach, and bend. (*Id.* at 57.) He opined that she should devote no more than 33% of her time on the job to lifting 15 pounds or less, and stated that she should never lift weights in excess of 15 pounds. (*Id.* at 56.) He also recommended that she not be exposed to dust, gases, fumes, chemicals, solvents, temperature extremes, excessive noise or allergenic agents. (*Id.*) By contrast, Dr. Truong placed no limitations on Voight's ability to drive, change positions or engage in repetitive movements. (*Id.* at 57.) He concluded, however, that Voight was totally disabled from performing any occupation, and stated that he did not know when she might be able to resume work activities. (*Id.*)

An Employer's Job Description Statement completed by a bank personnel supervisor reveals that Voight's Full Service Specialist position required little or no lifting, bending, climbing or pushing. (Def.'s Ex. G.) Nor does it appear that it exposed Voight to dust, fumes, gases, chemicals, or excessive noise. (*Id.*) Rather, the Full Service Specialist position appears to be a relatively sedentary office job that would not ordinarily involve the type of activities on which Dr. Truong placed restrictions. (Compare Def.'s Ex. E with Ex. G.)

After reviewing Voight's claim, MetLife solicited information from each of her treating physicians: Truong; Dr. Donald Becker, a neurosurgeon; Dr. Gary Wyatt, an oral surgeon; Dr. Virginia Watford, a psychologist; and Dr. Rinaldo Canalis, an otolaryngologist. (Def.'s Exs. H–L.) In response to MetLife's inquiry, Dr. Truong reiterated that

Voight was totally disabled. He stated that she suffered from disabling headaches, sinus blockage, fatigue, acromegaly, and depression. (Def.'s Ex. H at 65.) With respect to the acromegaly, Truong stated that Voight had had problems with this prior to her surgery. He indicated, however, that she "now has headaches" from sinus problems and migraines. (Id.) Dr. Truong stated that he had not conducted any psychological tests, and MetLife asserts that he also had not conducted an MRI, examined Voight's sinuses, or otherwise ascertained the cause of her headaches. (Id.)

Dr. Wyatt, plaintiff's oral surgeon, diagnosed chronic facial pain resulting from surgery on Voight's trans-mandibular joint ("TMJ") in August 1994 and trans-nasal brain surgery in January 1995. (Def.'s Ex. I at 70.) As a result of pain and immobility in the TMJ, he opined that Voight was unable to concentrate, had limited speech and eating capabilities, and was totally disabled. (Id. at 71–72.) As the specific indicators of these conditions, Dr. Wyatt listed "subjective complaints." (Id. at 72.)

Dr. Watford, Voight's psychologist, stated that Voight suffered from a major depressive disorder as a result of a string of traumatic events in her life, including the very recent and tragic death of her teenage son in an automobile accident, the subsequent death of her father due to cancer, and her own brain surgery. (Def.'s Ex. J.) Dr. Watford indicated that she had conducted no psychological tests, but nonetheless had concluded that Voight was totally disabled. (Id.) She stated that she was treating Voight two to three times a month, and that Voight had been responding well until her medical problems complicated matters. (Id. at 75–76.) Watford also noted that Voight's eating was impaired and that she was following a painful, time-consuming soft diet. She also stated that Voight was sleeping 12 1/4 hours per day. (Id. at 76.)

Dr. Becker, plaintiff's neurologist, opined that Voight was not capable of performing any work because of severe headaches from sinus blockage. He said that the blockage would require treatment when the surgical site was stable. (Def.'s Ex. K at 83–84.) Dr.

Becker noted that the condition was not permanent and that Voight should be able to return to work in October 1996. (Id. at 83.)

Dr. Canalis, plaintiff's ear, nose and throat ("ENT") specialist, stated that plaintiff was not able to work because of persistent headaches, retro-ocular pain and fatigue. (Def.'s Ex. L at 86.) He assessed her prognosis as good, however, and stated that the date upon which she could return to work would depend upon her endocrinologist's evaluation. (Id. at 86–87.)

MetLife sent Voight's records, including the opinions solicited from her doctors, to National Medical Review, an independent medical review company. It in turn referred the case to Dr. Robert Petrie, a physician specializing in occupational medicine. (Def.'s Fact 34.) In a report dated November 28, 1995 (the "November 1995 Report"), Dr. Petrie described Voight's condition as follows:

"Ms. Voight is a forty-three year-old female, who is suffering from severe headaches secondary to blocked sphenoid sinuses, difficulty concentrating secondary to the headaches, chronic facial pain with difficulty talking and eating, and depression." (Def.'s Ex. M.)

Dr. Petrie offered a thorough analysis of the medical records submitted by each of plaintiff's treating physicians, and concluded that Voight "ha[d] several identified medical problems, but none of which are accompanied by evidence of significant physical impairment which would prevent employment." (Id. at 97.) He stated that the August 1994 TMJ surgery was simply too remote in time "to attribute her symptoms to any active process related to [that] surgery itself." (Id. at 95.) He also observed that the trans-nasal brain surgery appeared to have healed and stated:

"Given the normal CT scan of the paranasal sinuses [as reported by Dr. Becker], and a normal examination as reported by Dr. Canalis, there does not appear to be a basis for concluding the claimant's ongoing headaches [are] related to any sinus problem." (Id. at 96.)

With respect to Voight's TMJ problems, Dr. Petrie offered his

"... opinion that there is no impairment related to her jaw, which would prevent her from performing the essential job functions of a bank supervisor. Similarly, it is my opinion that the pituitary resection site has healed, and that there is no evidence of ongoing sinus problems to such a degree, that the claimant would be unable to perform those job activities." (*Id.* at 96.)

Dr. Petrie stated his view that the "primary source of the claimant's difficulties is that of an ongoing depression" (*id.* at 95), and observed:

"I believe there is evidence of generalized pain complaints as well as reports of the attending psychologist outlining symptoms ranging from fatigue, to difficulty concentrating, to headaches, which indicate the likelihood of underlying psychiatric disorder. Nonetheless, there is insufficient psychiatric documentation to support a claim of total disability based on that diagnosis." (*Id.* at 97.)

Dr. Petrie recommended that Voight's psychologist, Dr. Watford, be asked to provide a comprehensive psychological history and detailed description of treatment. He also recommended that she be asked to describe clearly the psychological impairment that prevented Voight from performing the essential functions of her job. (*Id.* at 97.)

MetLife sent a copy of the November 1995 Report to each of Voight's attending physicians. It requested that each respond within 20 days, and specifically requested that Dr. Watford provide the additional documentation mentioned in Dr. Petrie's report. (Def.'s Fact 40; Ex. N.) MetLife received the following replies.

Dr. Canalis, plaintiff's ENT specialist, stated that Voight's MRI showed there might be inflammation in a region known to produce retro-ocular pain. He noted that such a condition could be treated with antibiotics, and that Voight had responded to antibiotics in the past. Canalis stated that Voight's symptoms were subjective, but might be clinically significant. If so, he observed, prolonged computer use, exposure to light and straining could cause the condition to worsen. (Def.'s Ex. O.)

Dr. Wyatt, oral surgeon, reported:

"[Voight's] jaw has improved, but because of the continued problems related to her brain surgery, she has continued myofacial pain and headaches. I feel that the temporomandibular joint surgery has been successful because she has maintained mobility and function. However, because of the continued residual problems from her brain surgery, I feel that she is still disabled and unable to work at her normal job responsibilities." (Def.'s Ex. Q at 104.)

Dr. Watford responded by giving a brief history of Voight's life and medical problems in which she opined that Voight had been coping well with the pain from her TMJ condition and her psychological traumas until the time of the trans-nasal brain surgery. (Def.'s Ex. P at 100–101.) Dr. Watford detailed Voight's symptoms and reiterated that she was unable to function. She indicated that she believed it would be at least a year before Voight was sufficiently recovered to resume her job responsibilities. (*Id.* at 102.)

After reviewing Dr. Watford's response, Dr. Petrie wrote a letter to MetLife on February 2, 1996, in which he stated that "[a]lthough Dr. Watford has provided additional psychosocial information, it remains my opinion that there is insufficient documentation to clearly demonstrate a psychiatric impairment." (Def.'s Ex. R at 106.) In fact, Petrie noted, it was unclear from Dr. Watford's letter whether she believed that Voight's disability stemmed from a psychiatric disorder. (*Id.* at 105.) He indicated that he would refer the matter to a consulting psychiatrist, Dr. Robert Slack, for further review. (*Id.* at 106.)

In a February 12, 1996, letter to MetLife, Dr. Slack opined that, while Voight appeared to suffer from a psychiatric condition, "the record [did] not establish disability." (Def.'s Ex. S at 107.) Dr. Slack observed that Voight voluntarily took leave because of a perceived inability to work, but that there was no evidence of any actual problems with her work performance. As Slack put it, "[b]eing unsure of one's abilities and experiencing psychological symptoms is not the equivalent of actually being unable to perform." (*Id.*) Second, he noted that Voight

had apparently undergone no psychological testing confirming that she had undergone a personality change due to physical illness. (*Id.*) Finally, Dr. Slack stated that, while Dr. Watford had provided a thorough report concerning Voight's self-reported symptoms, she offered no clinical assessment of her condition, and opined:

"Without this evidence it is impossible to evaluate ability/disability. The American Psychiatric Press Textbook of Psychiatry, 2nd edition, 1994, Chapter 38 (Law on Psychiatry), points out that the credible psychiatric assessment of functional impairment will avoid strictly subjective, idiosyncratic, ex cathedra pronouncements about the claimants' functional impairment and the need for future treatment. Instead, whenever possible, the claimant's functional impairment and future treatment needs should be evaluated according to the American Medical Association's Guide to the Evaluation of Permanent Impalement (1988, pgs. 227–233)." (*Id.* at 108.)

On March 4, 1996, MetLife denied Voight's claim for disability benefits. Its denial letter stated that it had reviewed the reports and records provided by Drs. Truong, Watford, Becker, Rigberg, and Canalis. It also stated that it had had the file reviewed by a board certified family practitioner and board certified psychiatrist, as well as by a Physicians' Roundtable. All of these physicians, the letter noted, concurred that "there [was] no documentation or objective evidence in the file to support a continued Total Disability...." (Def.'s Ex. T at 109.) With respect to Dr. Watford's report, it stated:

"... Dr. Watford ... makes it clear that Mrs. Voight has reported to her that [a] long succession of personal, family and medical traumas have led to her demoralization and subsequent 'giving up.' However, these horrendous experiences and her subsequent response to them does not necessarily constitute a medical disability. The records point out that Mrs. Voight voluntarily withdrew from work because of

what she perceived ... to be inability to work. The independent Medical Consultant found no evidence in the record that her supervisors were at any time displeased with her actual work performance." (*Id.* at 110.)

Voight was advised that she had 60 days within which to request a review of the decision denying her claim. (*Id.*)

After it sent the March 4 letter, MetLife received Dr. Becker's response to Petrie's November 1995 report. (Def.'s Ex. U.) Dr. Becker indicated that he neither agreed nor disagreed with Dr. Petrie's report, and suggested that any decision on Voight's disability claim be deferred until she could be evaluated by neurologist William Hornstein. (*Id.*)

On March 19, 1996, Voight formally requested review of the denial decision. (Def.'s Ex. W.) Thereafter, she was examined by a neurologist. In a letter dated March 13, 1996, Dr. Robert Sutter provided Voight's family physician, Dr. Stephen Ierardi, with his findings. (Def.'s Ex. V.) [1] He noted that Voight's cranial nerves, motor system, reflexes, sensory perceptions, cerebellar function, station and gait, and mental status were all normal. (*Id.* at 114.) He documented probable vascular migraine headaches, status post pituitary macro adenoma with CSF leak, history of TMJ, and history of depression. (*Id.*)

Dr. Petrie reviewed both Dr. Becker's response and Dr. Sutter's neurological evaluation. After doing so, he reaffirmed his earlier opinion that neither a physical nor psychological impairment prevented Voight from working. (Def.'s Ex. Y at 123.) He noted that Dr. Becker neither agreed nor disagreed with his earlier findings, and that Dr. Sutter reported "an unremarkable neurological evaluation." (*Id.* at 122.) Dr. Petrie reiterated that Dr. Watford's description of Voight's physical ailments was not supported by evidence. In this regard, he noted that Dr. Wyatt reported Voight had maintained mobility and function in her jaw, that the CSF leak attributable to the

---

1. It is unclear whether this neurological examination was in lieu of Dr. Hornstein's examination. MetLife asserts it agreed to allow Voight to be examined by the neurologist of her choice, but provides no evidence to support this claim. (See Def.'s Fact 56.) Voight, however, does not dispute MetLife's characterization of events.

trans-nasal surgery was not a current medical problem, and that her attending neurosurgeons did not endorse disability due to brain surgery. (*Id.* at 123.)

MetLife issued a final denial letter on August 26, 1996. The letter reviewed the medical information that had been collected, and concluded that Voight did not suffer an impairment that would prevent her from performing the material duties of her job as a Full Service Specialist. (Def.'s Ex. Z.) This action followed.[2]

In support of its motion for summary judgment, MetLife urges that the Plan vests it with discretionary authority to determine eligibility for benefits, and asserts that no genuine issue of material fact exists as to whether it acted arbitrarily or capriciously in denying Voight's claim. Voight counters that by ignoring the medical opinions of her own doctors and relying exclusively on its experts' reports, MetLife arbitrarily, capriciously and wrongfully denied Voight the benefits to which she was entitled under the Plan.

## II.

## DISCUSSION

### A. Legal Standard Governing Summary Judgment

Summary judgment must be granted if the evidence supporting the motion for summary judgment shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party moving for summary judgment may carry its initial burden by pointing out to the district court that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Ca-*

*trett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, supra,* 477 U.S. at 322, 106 S.Ct. 2548.

To avoid summary judgment, the non-movant must set forth specific evidence showing that there remains a genuine issue of material fact for trial. *Celotex, supra,* 477 U.S. at 324, 106 S.Ct. 2548. The non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading." A factual dispute is "genuine" if a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his or her favor. *Id.* at 255, 106 S.Ct. 2505. If the non-moving party's evidence is merely colorable or is not significantly probative, then summary judgment must be granted. *Id.* at 249–50, 106 S.Ct. 2505.

Here, the facts appear to be undisputed. The application of the law to those facts is thus properly resolved in the context of this motion. See *Celotex, supra,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265.

### B. Standard Of Review For Benefits Denial Decisions.

■ In reviewing the benefits eligibility decision of an ERISA fiduciary, the court must first determine whether "the benefit

---

**2.** Voight asserts that MetLife has submitted an incomplete claims record to the court, but does not indicate what documents have been omitted. (See Pl.'s Opp. at 5:12–14.) After reviewing the evidentiary record submitted by the parties, it appears that the only documents not included in MetLife's appendix are letters that post-date December 3, 1996. (See Pl.'s Ex. 1 at 65–70.) These letters were not received by MetLife until after it had sent its final denial letter on August 26, 1996. On January 10, 1997, in response to a request by Voight's counsel that it reexamine her claim (Pl.'s Ex. 1 at 68), MetLife advised the

attorney that a decision would be rendered within 60 days. This action was filed in Superior Court three days later, on January 13. Presumably, therefore, MetLife's re-review of Voight's claim was never completed. Moreover, whether it was or not is irrelevant to this action, which challenges MetLife's denial of benefits on August 26, 1996. In evaluating MetLife's decision to deny disability benefits, the court may consider only the evidence that was before the ERISA administrator at the time it made its claims decision. *Snow v. Standard Ins. Co.,* 87 F.3d 327, 332 (9th Cir.1996).

plan gives to the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If it does, then the court must review the administrator's decision only for abuse of discretion. *Taft v. Equitable Life Assur. Society,* 9 F.3d 1469, 1471 (9th Cir.1994); *Jones v. Laborers Health & Welfare Trust,* 906 F.2d 480, 481 (9th Cir.1990).[3]

■ The abuse of discretion standard requires that the court give significant deference to the plan administrator's decision:

"It is an abuse of discretion for an ERISA plan administrator to make a decision without any explanation, or in a way that conflicts with the plain language of the plan, or that is based on clearly erroneous findings of fact. The mere fact that the plan administrator's decision is directly contrary to some evidence in the record does not show that the decision is clearly erroneous. Rather, review under the clearly erroneous standard is significantly deferential, requiring a definite and firm conviction that a mistake has been committed. That standard certainly does not permit the overturning of a decision where there is substantial evidence to support the decision, that is, where there is relevant evidence that reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Snow v. Standard Ins. Co.,* 87 F.3d 327, 331–332 (9th Cir.1996) (citations omitted).

■ Thus, a court reviewing an ERISA benefits decision for abuse of discretion may not substitute its judgment for that of the administrator unless the latter's decision was clearly erroneous in light of the available record, or there was no reasonable basis for it. *Taft, supra,* 9 F.3d at 1473; *Horan v. Kaiser Steel Retirement Plan,* 947 F.2d 1412, 1417 (9th Cir.1991); *Jones, supra,* 906 F.2d at 482. A denial of benefits cannot be said to be arbitrary or capricious if it is supported by substantial evidence. *Sando-*

*val v. Aetna Life and Casualty Ins. Co.,* 967 F.2d 377, 382 (10th Cir.1992). In this context, "[s]ubstantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by [the administrator]. Substantial evidence requires 'more than a scintilla but less than a preponderance.'" *Id.* (quoting from *Flint v. Sullivan,* 951 F.2d 264, 266 (10th Cir.1991)).

■ In assessing whether an ERISA fiduciary has abused its discretion, courts must consider a number of factors: whether the decision conflicts with the plain language of the plan (see *Winters v. Costco Wholesale Corp.,* 49 F.3d 550, 553 (9th Cir.1995), cert. denied, 516 U.S. 908, 116 S.Ct. 276, 133 L.Ed.2d 197 (1995)); whether the fiduciary provided an explanation of its decision (*id.; Taft, supra,* 9 F.3d at 1472); whether the fiduciary made clearly erroneous findings of fact in support of the benefits determination (*Taft, supra,* 9 F.3d at 1473; *Jones, supra,* 906 F.2d at 482); and whether the fiduciary was operating under a conflict of interest at the time the decision was made (*Taft, supra,* 9 F.3d at 1474). See also *deNobel v. Vitro Corp.,* 885 F.2d 1180, 1188 (4th Cir.1989) (other factors include whether the administrator's interpretation is consistent with the goals of the plan; whether it renders meaningless some language in the plan documents or is internally inconsistent; whether it is at odds with the substantive or procedural requirements of ERISA; and whether the relevant plan provision has been consistently applied).

## C. MetLife's Denial Of Voight's Claim

### 1. MetLife's Decision Must Be Reviewed For An Abuse Of Discretion

■ The Plan's ERISA Conforming Instrument clearly confers discretionary authority on MetLife to construe and apply the terms of the Plan in connection with reviewing benefits decisions. (See Def.'s Ex. C.) It also requires, however, that in return for the bank's payment of premiums, MetLife pay the insurance and other benefits provided to

---

**3.** This is essentially equivalent to the "arbitrary and capricious" standard used by many courts prior to the Supreme Court's decision in *Bruch.*

See *Snow v. Standard Ins. Co.,* 87 F.3d 327, 330 (9th Cir.1996).

employees under the Plan. (Def.'s Ex. A at 1.) In *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Technology, Inc.,* 125 F.3d 794, 796 (9th Cir.1997), the Ninth Circuit held that an insurance company that is both the funding source and administrator of an ERISA plan has an inherent conflict of interest.

Where this is the case, the court will apply the abuse of discretion standard of review unless it appears that the conflict influenced the administrator's benefits decision, or that the apparent conflict was in fact an actual conflict. *Id.* at 798; *Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317, 1323 (9th Cir. 1995). "To make such a showing, the affected beneficiary must come forward with 'material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligations to the beneficiary.'" *Lang, supra,* 125 F.3d at 798 (quoting *Atwood, supra,* 45 F.3d at 1323.) In *Lang,* the beneficiary satisfied this burden by demonstrating that the plan administrator's original explanation of the benefits denial decision was inconsistent with its explanation on appeal. *Id.* at 799. See also *Brown v. Blue Cross & Blue Shield of Ala., Inc.,* 898 F.2d 1556, 1569 (11th Cir. 1990).

In the present case, Voight has not argued that MetLife's decision was the product of a conflict of interest, nor attempted to adduce "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show" that this was the case. Voight argues simply that MetLife acted arbitrarily in denying her benefits. Accordingly, since Voight has not demonstrated that the conflict led MetLife to breach its obligations under the Plan, the benefits denial decision must be reviewed for abuse of discretion.

Voight argues that MetLife abused its discretion by construing "Total Disability" in such a way that she would have had to be "comatose" to secure benefits under the Plan. She also argues that MetLife acted arbitrarily and capriciously by ignoring the overwhelming opinions of her treating specialists in favor of the views of its own experts. The record does not support either assertion.

## 2. MetLife's Construction Of The Term "Total Disability" Is Not Unreasonable

■ In order to obtain long term disability benefits under the Plan, Voight had to submit "proof" to MetLife that she was totally disabled. (Def.'s Ex. B at 13.) "Total Disability" is defined, *inter alia,* to mean "that, due to an injury or sickness, you:

1. are completely and continuously unable to perform each of the material duties of your regular job; and

3. require the regular care and attendance of a Doctor." (Def.'s Ex. B, at 12.)

Voight argues that MetLife equates "Total Disability" with helplessness, and that such a construction is unreasonable. See *Saffle v. Sierra Pacific Power Co.,* 85 F.3d 455, 458–459 (9th Cir.1996); *Helms v. Monsanto Co., Inc.,* 728 F.2d 1416, (11th Cir.1984) (holding that a literal interpretation of "total disability" as absolute helplessness is unreasonable). She asserts that MetLife

"focused on the fact that [she] was not completely unable to perform *all of her duties* as a bank supervisor, since that would apparently require, in their view, that she be comatose. Since Plaintiff is not precluded from the act of speaking into the phone because of her condition, then, so their argument goes, Voight is 'not unable to perform each of the material duties of [her] regular job.'" (Pl.'s Opp. at 6:18–24 (emphasis original).)

While Voight correctly claims that such a construction of the Plan terms would be unreasonable and an abuse of discretion, the administrative record does not reflect that MetLife employed such a definition.

In evaluating Voight's claim, MetLife obtained a detailed description of the physical requirements and job responsibilities of her position at the bank. (See Def.'s Ex. G.) As the description reveals, the job of a Full Service Specialist involves customer service and administrative responsibilities, and imposes minimal physical requirements. In soliciting the opinions of plaintiff's specialists,

MetLife asked whether they felt "she was totally disabled from performing her occupation as a Senior Full Service Specialist." (Def.'s Exs. H–L.) Along with several questions regarding her treatment and medical prognosis, the letters specifically inquired "what activities of daily living [Voight is] capable or not capable of," and "what specific mental functions related to [her] usual job or work are affected." (*Id.*)

In letters to Drs. Becker and Canalis, MetLife asked whether Voight had "been released to return to work at her occupation as a full-time Senior Full Service Specialist? ... If no, what specific restrictions/limitations prevent [her] from performing her occupation?" (Def.'s Exs. K, L.) While each of these questionnaires probes Voight's limitations in performing the functions of her job, none appears to focus unreasonably on whether there is a single task she is unable to perform.

That this is so is evident from the reports submitted by MetLife's medical consultants. In his November 1995 report, Dr. Petrie explicitly considered whether Voight could perform a primarily sedentary job that entailed administrative and customer service responsibilities, little lifting and occasional bending. (Def.'s Ex. M at 95.) Dr. Petrie's description of the position did not focus on specific mechanical tasks, i.e., answering the telephone. Rather, it concentrated on broad categories of responsibility:

"[T]his position includes focusing on the individual needs of each customer, directly or through the support of other employees, in a manner that would promote long-term banking relationships; providing customer service for new accounts, vault and safety deposit boxes; scheduling employee work hours and training new employees. Occupational requirements for this position are primarily sedentary in nature with only occasional carrying of items up to ten pounds and occasional bending...." (*Id.*)

Based on this delineation of tasks, Dr. Petrie determined that the medical evidence did not establish Voight was totally disabled from performing the essential functions of her job:

"The claimant was employed in a sedentary job. It is my opinion that there is no impairment related to her jaw, which would prevent her from performing the *essential job functions* of a Bank Supervisor. Similarly, it is my opinion that the pituitary resection site has healed, and that there is no evidence of ongoing sinus problems to such a degree, that the claimant would be unable to perform those job activities." (*Id.* at 96 (emphasis added).)

Similarly, MetLife's August 26, 1996 denial letter stated that its decision had been based on a job description provided by Voight's employer. (Def.'s Ex. Z at 125.) Nowhere in the record is there an indication that a MetLife representative, or a physician retained by MetLife, found that Voight's claim had to be denied because she remained able to perform at least one material duty of her job. The record, therefore, does not support Voight's argument that MetLife's denial was based on an unreasonably literal construction of the term "Total Disability."

Voight's real disagreement with MetLife turns on their respective interpretations of the medical evidence. The November 1995 Petrie report, the March 4, 1996 denial letter, and the August 26, 1996 denial letter clearly stated that MetLife's decision was based on the absence of "objective evidence" of total disability. (Def.'s Exs. M, T, and Z.) Dr. Petrie opined, for example, that Voight's treating specialists had provided nothing more than subjective evidence of disability. It was not unreasonable for MetLife to require objective evidence as "proof" of total disability. Given that MetLife has discretionary authority to construe the terms of the Plan, Voight must prove that MetLife's interpretation of "Total Disability," or its "proof" requirements, were arbitrary and capricious. *Hoover v. Blue Cross and Blue Shield of Ala.,* 855 F.2d 1538, 1541 (11th Cir.1988); *Fielding v. Int'l Harvester Co.,* 815 F.2d 1254 (9th Cir.1987), overruled on other grounds in *Bruch, supra,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80. Voight has failed to meet her burden in this regard.

**3. MetLife's Decision Was Not Based On Clearly Erroneous Factual Findings**

Voight also argues that it was unreasonable for MetLife to ignore the opinions of

physicians who had treated her on a regular basis in favor of opinions formed by doctors who reviewed only a portion of the medical record. Given the opinions expressed by her doctors, Voight urges, Dr. Petrie's opinion was clearly erroneous.

The record reflects that Dr. Petrie was an independent medical reviewer. (Def.'s Fact 34.) In his November 1995 Report, Dr. Petrie thoroughly explained the basis for his belief that Voight's medical records did not provide "objective evidence" of disability. (Def.'s Ex. M.) He noted that, with the exception for her psychologist, each of Voight's specialists attributed her disability to medical problems outside their particular specialty. Dr. Wyatt, plaintiff's oral surgeon, indicated that her TMJ surgery had been successful, and attributed her headaches and facial pain to the brain surgery. Dr. Becker, plaintiff's neurologist, stated that the brain surgery had been successful, and attributed her headaches to sinus blockage. Dr. Canalis, plaintiff's ENT doctor, noted that her nasal cavity had healed and was not blocked. Dr. Petrie opined that each of the physicians' reports lacked objective evidence of physical problems in the area of specialty. He also concluded that the report submitted by Dr. Watford, Voight's psychologist, provided inadequate proof that she suffered from a psychiatric disability.

MetLife provided a copy of Dr. Petrie's report to each of Voight's treating physicians for comment. (Def.'s Fact 40.) Their responses were somewhat equivocal. Voight's ENT specialist suggested that part of her pain might be the result of inflammation in her nasal cavity. He noted, however, that this condition could be treated with antibiotics, to which she had responded in the past. (Def.'s Ex. O.) Voight's oral surgeon asserted that the TMJ surgery had been successful and that her jaw maintained mobility and function. He suggested, instead, that Voight's disabling condition was caused by the "continued residual problems from her brain surgery." (Def.'s Ex. Q.) Voight's psychologist steadfastly maintained that her psychological condition was disabling, but performed no psychological tests to document this. (Def.'s Ex. P.)

MetLife asked Dr. Petrie to review these responses, and his opinion remained unchanged. (Def.'s Ex. 46.) He cited once again the lack of any objective evidence to support Dr. Watford's psychiatric opinion. He indicated, however, that he would refer the matter to a psychiatric expert, Dr. Robert Slack, for a further opinion. (Def.'s Ex. R.) Dr. Slack confirmed Petrie's assessment, noting the lack of psychiatric testing and objective findings, i.e., an evaluation conducted according to generally accepted principles established by the American Medical Association. (Def.'s Ex. S.) Based on Dr. Petrie's November 1995 report, his review of the further evidence provided by Voight's physicians, and Dr. Slack's psychiatric review, MetLife denied her claim for benefits.

Thereafter, MetLife received a belated response to the November 1995 Report from Voight's neurosurgeon, Dr. Becker. While he had earlier opined that Voight's headaches were caused by sinus blockage, Dr. Becker stated that he neither agreed nor disagreed with Dr. Petrie's opinion, and recommended further evaluation by a neurologist. Thereafter, Voight submitted the report of a neurologist, Dr. Sutter. He indicated that all of Voight's neurological reflexes and systems were normal. MetLife forwarded this report to Dr. Petrie for review, and he found nothing in it to support a finding that Voight was totally disabled. (Def.'s Exs. V, Y.)

Thus, at the time it determined to deny Voight's claim for benefits, MetLife had evidence before it that supported a finding Voight was not totally disabled. See *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 (11th Cir.1997) (the plan administrator was justified in denying plaintiff's claim despite the treating physician's conclusion that she was disabled); *Sandoval, supra,* 967 F.2d at 382 (denial of claim in the face of physicians' reports reaching contrary conclusions regarding disability was upheld); *Steinmann v. Long Term Disability Plan of May Dept. Stores Co.,* 863 F.Supp. 994 (E.D.Mo.1994) (despite the treating physician's conclusion that the claimant was disabled, the plan administrator was justified in

denying benefits on the basis that there was an absence of persuasive evidence of disability).

The opinions on which MetLife relied were not, on their face, irrational, unreasonable or the clear product of a self-interest. While they differed from the opinions provided by Voight's treating physicians, those opinions suffer from a lack of diagnostic precision and objective supporting evidence. Moreover, while those doctors opined that Voight was disabled, several ruled out medical problems in their area of specialty as the cause of such disability. For this reason, MetLife contends that the opinions of Voight's own doctors supported its benefits decision.

Even if they did not, however, the mere fact that MetLife accepted the opinions of its independent medical reviewers rather than those of Voight's treating physicians is not proof of arbitrary or capricious conduct. See *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 602 (5th Cir.1994) (upholding a benefits denial decision based on the medical consultants' opinions that were contrary to those of plaintiff's treating physicians); *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir.1994) (decision to deny benefits was not unreasonable where it "simply came down to a permissible choice between the position of ... Metlife's independent medical consultant, and the position of [the treating physicians]"). Cf. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir.1995) ("Where the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict"); *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (per curium) (as amended) (holding that "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings").[4]

MetLife sought input from Voight's physicians on two occasions, and gave them an opportunity to comment on the opinions of its independent medical reviewer. Because Voight's psychologist asserted she was totally disabled due to depression, MetLife sought an opinion from an independent psychiatrist. When Voight's neurosurgeon recommended that she be evaluated by a neurologist, MetLife accepted a neurology report and submitted it to Dr. Petrie for review. As this exposition demonstrates, MetLife considered all information presented to it, and was amenable to suggestions that further evidence be obtained.

Furthermore, both Dr. Petrie's reports and MetLife's denial letters provided a thorough explanation for the denial of benefits. Based on a review of the entire record, therefore, it cannot be said that MetLife's decision was clearly erroneous or not supported by substantial evidence. "Reasonable minds" could accept Dr. Petrie and Dr. Slack's conclusions (see *Snow, supra*, 87 F.3d at 332; *Sandoval, supra*, 967 F.2d at 382). Reasonable minds might also disagree, but it was not so clearly erroneous as to constitute an abuse of discretion. See *Snow, supra*, 87 F.3d at 331–332. Accordingly, the court may not substitute its judgment for that of MetLife.

## III.

### CONCLUSION

For the foregoing reasons, defendant Metropolitan Life Insurance Company's motion for summary judgment is granted.

### JUDGMENT FOR DEFENDANT METROPOLITAN LIFE INSURANCE COMPANY

The Motion of defendant Metropolitan Life Insurance Company for Summary Judgment came on regularly for hearing on October 5, 1998. The Court having considered the evi-

---

4. See also *Brooks v. The Guardian Life Ins. Co.*, 995 F.Supp. 1174, 1180 (D.Kan.1998) (denial of claim when independent medical reviewer disagreed with conclusions of claimant's personal physician); *Best v. Nissan Motor Corp.*, 973 F.Supp. 770, 777 (M.D.Tenn.1997) (it was not an abuse of discretion to rely on consistent opinions of two independent medical reviewers contrary to opinion of treating physician).

dence presented by the parties, and having reviewed the briefs and heard the argument of counsel,

IT IS ORDERED AND ADJUDGED

1. That plaintiff Lynne Voight take nothing by way of her complaint against Metropolitan Life Insurance Company;

2. That the action be, and it hereby is, dismissed; and

3. That defendant Metropolitan Life Insurance Company recover its costs of suit herein.