**Judith LANG, aka Judith Clark–Lang, Plaintiff–Appellant,**

v.

**LONG–TERM DISABILITY PLAN OF SPONSOR APPLIED REMOTE TECHNOLOGY, INC.; Applied Remote Technology, Inc., a California Corporation as Sponsor & Fiduciary of the Long–Term Disability Plan; Standard Insurance Company, A Mutual Life Insurance Company, as Administrator & Fiduciary of the Long–Term Disability Plan, Defendants–Appellees.** ·

No. 96–56080.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 1997.

Decided Sept. 11, 1997.

Jeffrey I. Ehrlich, Washington, D.C., for plaintiff–appellant.

Howard Bennett Hellen, San Diego, California, for plaintiff–appellant.

Michael A. Conley, Pillsbury Madison & Sutro, LLP, San Francisco, California, for defendants–appellees.

Before: SCHROEDER, FERGUSON, and LEAVY, Circuit Judges.

SCHROEDER, Circuit Judge:

Judith Lang, a former contracts manager for Applied Remote Technology, Inc., appeals the district court's grant of summary judgment in favor of defendants-appellees on her claim for long-term disability benefits. The appellees are Applied Remote Technology, the sponsor of the welfare benefit plan (the "Plan") under which Lang claimed the benefits, and Standard Insurance Company, the issuer and administrator of the Plan. In her suit, under Section 502(a)(1)(B) of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), Lang claims that Standard wrongfully terminated her benefits. Standard contends that its decision to limit Lang's benefits to two years was proper because her disability was "caused or contributed to" by a "mental disorder," for which the Plan provided a two-year limit. Lang disagrees that her disability was due to a "mental disorder." She argues that the Plan is ambiguous as to what constitutes a "mental disorder" and that Standard's determination was tainted by self-interest. We conclude that Standard's conflict of interest, arising out of its dual role as the administrator and funding source for the Plan, affected its decision in Lang's case. For that reason, Standard's interpretation of the Plan and its ultimate determination must be reviewed without deference. We hold the benefits were improperly terminated.

## BACKGROUND

Lang first applied for benefits in December of 1992. She indicated that her inability to work was triggered by stress arising from her job. The symptoms she described were "uncontrollable crying," "throwing up before work," and "inability to concentrate." Lang listed a psychiatrist, Dr. Venn–Watson, as her treating physician. Dr. Venn–Watson had diagnosed Lang as having depressive neurosis and was treating Lang for "insomnia" and "frequent crying spells." Upon receipt of Lang's application for benefits, Standard informed Lang that it intended to apply the "mental disorder" limitation to her claim. Under the Plan, Standard was authorized to terminate the payment of long-term disability benefits after two years if the beneficiary's disability was "caused or contributed to" by a "mental disorder." "Mental disorder" was defined in the Plan as a "mental, emotional, behavioral, or stress-related disorder." The Plan, however, was silent as to whether the administrator should look to causes or symptoms when determining whether the claimant had a "mental disorder" for purposes of applying the limitation. The Plan granted discretion to Standard to construe the terms of the Plan.

While Lang was receiving benefits during the two-year period, her family care physician, Dr. Wasserman, diagnosed her with fibromyalgia. Fibromyalgia is a type of muscular or soft-tissue rheumatism that affects principally muscles and their attachment to bones, but which is also commonly accompanied by fatigue, sleep disturbances, lack of concentration, changes in mood or thinking, anxiety and depression. See *Fibromyalgia*, Arthritis Foundation Pamphlet at 1, 5 (1992). The depression and anxiety associated with fibromyalgia are believed to be symptoms of this muscular disease, rather than causes of it. Researchers suggest that there is a possible "biologic link" between fibromyalgia and some forms of depression and chronic anxiety. *Id.* at 5. In addition, the Pamphlet reports that while "[t]he single exact cause of fibromyalgia is unknown[,] ... a number of stresses ... may precipitate the generalized pain, fatigue, sleep, and mood problems that characterize fibromyalgia." *Id.* at 7. It is often difficult to diagnose fibromyalgia, and "[o]ften people with fibromyalgia have undergone many tests and have seen many different specialists while in search of an answer." *Id.* at 10. Lang was experiencing all of the symptoms associated with fibromyalgia at all relevant times.

Armed with her new fibromyalgia diagnosis, Lang requested that Standard reassess its initial determination to apply the mental disorder limitation to her claim. In response, Standard sent Lang's medical rec-

ords to Dr. Fraback, a rheumatologist often used by Standard to evaluate long-term disability claims. He did not examine Lang, but opined, in a short memorandum, that Lang's disability was primarily due to her depression, and that Lang's fibromyalgia diagnosis was not clear because Lang's doctor had failed to identify the requisite number of trigger points. On the basis of that report, Standard refused to remove the mental disorder limitation. Standard explained to Lang in a letter dated January 9, 1995, that its decision was based on the fact that it had found no objective medical evidence to support Lang's claim that she had fibromyalgia, and that it still believed that Lang's disability was "caused or contributed to" by depression.

Standard's Quality Assurance Unit reviewed this initial denial, and affirmed it in a letter dated February 24, 1995, although on different grounds. This time, Standard stated that it was no longer disputing that Lang had fibromyalgia, and wrote that it was aware of the various symptoms and "diagnostic criteria established for this condition as set forth by the American College of Rheumatology." However, the Quality Assurance Unit still denied Lang's claim, but on the ground that Lang had failed to establish that her fibromyalgia, "separate from psychological factors, [was] disabling in and of itself." Standard also stated, for the first time, that it "consider[ed] symptoms, not cause" when deciding whether to apply the "mental disorder" limitation. Standard, in effect, took the position that even if Lang's depression was a symptom of her physical disorder, fibromyalgia, the limitation would still apply.

## DISCUSSION

### 1. Standards of Review

■ We review the district court's grant of summary judgment de novo. *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan,* 46 F.3d 938 (9th Cir.1995). We also review de novo the district court's choice and application of the standard of review applicable to decisions by fiduciaries in the ERISA context. *Taft v. Equitable Life Assurance Soc'y,* 9 F.3d 1469, 1471 (9th Cir. 1993).

■ When an ERISA plan vests its administrator with discretion to determine eligibility for benefits and to construe the terms of the plan, as the Plan does in this case, the district court ordinarily reviews the administrator's determination for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989); *Taft,* 9 F.3d at 1471.

The degree of judicial deference associated with this standard of review may, however, be affected by factors such as conflict of interest. *See Firestone,* 489 U.S. at 115, 109 S.Ct. at 956–57 (courts must weigh conflict as a "factor" in determining whether abuse of discretion has occurred); *Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1564 (11th Cir.1990) (the abuse of discretion standard "must be contextually tailored[,]" so that the degree of deference accorded to the plan fiduciary depends "upon the dynamics of the decisionmaking process[ ]") (quotations omitted).

■ The Plan in this case is actually an insurance policy issued and administered by Standard. Given Standard's dual role as both the funding source and the administrator of the Plan, we are faced with an inherent conflict of interest situation, and must take this factor into account. *Brown,* 898 F.2d at 1561 ("Because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business.")

■ Nevertheless, the presence of conflict does not automatically remove the deference we ordinarily accord to ERISA administrators who are authorized by the plan to interpret a plan's provisions. We considered this issue in *Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317, 1322 (9th Cir.1995). We there observed that our circuit's approach is similar to the Eleventh Circuit's, where the leading decision is *Brown, supra.* Judge Johnson's opinion for the Eleventh Circuit in *Brown* contains an extensive and sensitive discussion of the reasons for replacing traditional deference with a different analysis when dealing with ERISA plans where there

exists an inherent conflict of interest. *Brown* explained that plans such as this one, funded by insurers and also administered by them, are not true trusts. The administrator's decisions in these cases are hence not as easily justified as the decisions of a fiduciary in the case of a true trust. *See Brown*, 898 F.2d at 1567.

Looking to *Brown* for guidance, we held in *Atwood* that "our traditional abuse of discretion review [is not altered] in the absence of facts indicating that [the] conflicting interest caused a serious breach of the plan administrator's fiduciary duty to . . . the plan beneficiary". *Atwood*, 45 F.3d at 1322. Instead, we held that we must review the decisions of an apparently conflicted employer- or insurer-fiduciary under the traditional abuse of discretion standard unless it appears that the conflict may have influenced the decision. To make such a showing, the affected beneficiary must come forward with "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligations to the beneficiary." *Id.* If the beneficiary satisfies that burden, our review remains for abuse of discretion, but it becomes "less deferential." *See Snow v. Standard Ins. Co.*, 87 F.3d 327, 331 (9th Cir.1996) (citing *Atwood*, 45 F.3d at 1322).

In *Atwood* we reviewed the approaches of various circuits to the problem of reconciling the discretion vested in the administrator, with the requirement inherent in trust law, that a fiduciary act without self-interest. We concluded that once the beneficiary comes forward with evidence that the fiduciary may have acted in its own self-interest, a more careful review must be undertaken. We explained that:

> principles of trust law require us to act very skeptically in deferring to the discretion of an administrator who appears to have committed a breach of fiduciary duty. . . .
>
> Under the common law of trusts, any action taken by a trustee in violation of a fiduciary obligation is presumptively void. . . . Where the affected beneficiary has come forward with material evidence

of a violation of the administrator's fiduciary obligation, we should not defer to the administrator's presumptively void decision.

*Atwood*, 45 F.3d at 1323 (internal citations omitted).

 In that circumstance, the plan bears the burden of rebutting the presumption by producing evidence to show that the conflict of interest did not affect its decision to deny or terminate benefits. *Id.* The plan might be able to meet this burden, for example, by showing how its decision in fact benefitted the plan as a whole and therefore the rest of the beneficiaries under the plan. *See Brown*, 898 F.2d at 1566–67. For example, the administrator might be able to show that its decision was intended to prevent an unanticipated expenditure that would have depleted the resources available to other beneficiaries of the plan. *Id.* at 1568. Such a showing would be sufficient because the fiduciaries' main ERISA duty is "to act solely in the interest of plan participants and beneficiaries." *Fine v. Semet*, 699 F.2d 1091, 1095 (11th Cir.1983). If the plan fails to carry its burden, however, our review becomes de novo, "without deference to the administrator's tainted exercise of discretion." *Atwood*, 45 F.3d at 1323.

**2. Application of the *Atwood* test to Lang's Plan**

 To trigger de novo review of Standard's decision, Lang had the initial burden to provide sufficient probative, material evidence that Standard may have acted in its own self-interest. This court has never had occasion to decide what kind of showing is sufficient to satisfy this threshold requirement and shift the burden to the administrator.

Sound specific guidance is provided in *Brown*. There, the administrator had originally denied payments for two periods of hospitalization, and then changed its position for one of those periods, on the basis of no new evidence. The court deemed this inconsistency an indication that the insurer's decision may have been tainted by self-interest. *Brown*, 898 F.2d at 1569.

■ In this case, the inconsistencies in Standard's position are even sharper. The reason given for the termination of benefits in the January 9, 1995 letter was that Lang did not have fibromyalgia. Standard's view at that time was therefore that Lang had not shown that her disability was "caused or contributed to" by a physical ailment. On review, when confronted with clear evidence from her treating physician that she did suffer from a physical ailment—fibromyalgia— Standard took the position that Lang would have to make a further showing that the fibromyalgia "in and of itself" was disabling. Standard further justified its denial on the theory that, regardless of the cause of the disability, the critical determinants of whether a person was afflicted with a "mental disorder" were symptoms and not causes. We conclude that the inconsistencies in the reasons Standard gave for its refusals to lift the "mental disorder" limitation constitute material, probative evidence that its decision was affected by self-interest.

■ That does not end our inquiry, however, because once the claimant has met her initial burden of producing evidence from which it could be inferred that the plan's decision was tainted, the burden shifts to the plan administrator to show that its decision was in fact in furtherance of its fiduciary responsibilities. *Atwood,* 45 F.3d at 1323. Standard offers no explanation that its decision was made for the benefit of other plan participants and beneficiaries. Nor do we perceive any indication in the record of such a motivation. We therefore conclude that Standard's decision to limit benefits on the basis of a determination that Lang's disability was due to a "mental disorder" is not entitled to deference and is subject to de novo review.

The two-year limitation in the Plan relates to disabilities "caused or contributed to" by a "mental disorder." Lang contends that because the record reflects that her disability was caused by a physical illness, fibromyalgia, the limitation does not apply. In its February 24 letter, however, Standard interpreted the term as referring to symptoms, and not to causes. The Plan language presents an almost classic ambiguity. *See Kunin*

*v, Benefit Trust Life Ins. Co.,* 910 F.2d 534 (9th Cir.1990); *Phillips v. Lincoln Nat. Life Ins. Co.,* 978 F.2d 302 (7th Cir.1992). Both *Kunin* and *Phillips* considered a similar phrase, "mental illness," and held that it was ambiguous in that it could reasonably refer either to illnesses with non-physical causes, or to illnesses with physical causes, but exhibiting both physical and non-physical symptoms.

If we were according Standard's interpretation the deference ordinarily due an administrator vested with discretion to interpret the plan, we would have to uphold Standard's interpretation as reasonable. In this case, however, Standard is no longer entitled to such deference, because Lang has satisfied her burden of showing the presence of a taint, and Standard has not rebutted it.

■ Accordingly, we may construe the Plan in accordance with the rules normally applied to insurance policies. Ambiguities in ordinary insurance contracts are construed against the insurance company. We noted in *Kunin, supra,* in the case of an insured plan that did not grant the administrator discretion to construe its terms, that this is the law of California and virtually every other jurisdiction in the country. *Kunin,* 910 F.2d at 539. *See generally,* 2 G. Couch, R. Anderson and M. Rhoades, *Couch on Insurance 2nd* § 15:83, at 399 n.4 (rev. ed.1984). The rule, known as the doctrine of *contra proferentem,* requires us to adopt the reasonable interpretation advanced by Lang, i.e., that the phrase "mental disorder" does not include "mental" conditions resulting from "physical" disorders.

In this case there is no question that Lang was under a disability from the time that she originally applied for benefits in 1992. Moreover, there is nothing in the record to indicate that the nature of her physical or mental condition materially changed. The only change is the diagnosis of the cause of her disability from depression unrelated to any physical disease, to fibromyalgia, an affliction with a physical source, but which is often accompanied by depression.

The district court did not conduct the appropriate conflict of interest analysis and

hence accorded Standard a deference to which it was not entitled. Lang is entitled to reinstatement of her long-term disability benefits.

The judgment of the district court is REVERSED and the case REMANDED with instructions to enter judgment in favor of Lang.