Michael MITCHELL, Plaintiff,

v.

METROPOLITAN LIFE INSURANCE COMPANY; CB Richard Ellis Long Term Disability Plan; UNUM Life Insurance Company of America, Defendants.

No. CV 05–00810 DDP (RNBx).

United States District Court, C.D. California.

Dec. 3, 2007.

**1134**

Dorothy Clay Sims, Sims Amat Stakenborg and Henry, Ocala, FL, Glenn R. Kantor, Kantor & Kantor, Northridge, CA, for Plaintiff.

Lawrence E. Butler, Robert M. Cleary, Seyfarth Shaw, San Francisco, CA, Julie I. LaRoe, Seyfarth Shaw, Los Angeles, CA, Derek S. Whitman, Los Angeles, CA, for CB Richard Ellis Long Term Disability Plan.

Michael B. Bernacchi, Keiko J. Kojima, Burke Williams and Sorensen, Los Angeles, CA, for UNUM Life Insurance Company of America.

Tracy A. Collins, Agoura Hills, CA, for Tracy Collins Law Offices.

Lowell D. Kass for Metropolitan Life Insurance Company.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

DEAN D. PREGERSON, District Judge.

Plaintiff Michael Mitchell brings this action under 29 U.S.C. section 1132(a)(1)(B) seeking long-term disability ("LTD") benefits pursuant to a benefit plan provided by his employer, CB Richard Ellis ("CBRE"). Mitchell claims a disability for several health problems, including chronic fatigue syndrome, restless legs syndrome, hemochromatosis, and depression.

From January 1, 2000 until December 1, 2003, the LTD plan was administered un-

der a group insurance policy by Defendant and cross-claimant UNUM Life Insurance Company of America ("UNUM"). As of January 1, 2004, the LTD plan was administered under a group insurance policy by Defendant Metropolitan Life Insurance Company ("MET").

In April 2004, when MET covered the plan, Mitchell filed with MET for LTD benefits. In his initial administrative claim with MET, Mitchell stated that his disability began in October 2003, when UNUM covered the plan. MET initially denied Mitchell's claim because he was "still working." MET then denied Mitchell's appeal based upon a lack of objective evidence that Mitchell was disabled under the plan. After the appeal, Mitchell instituted this action. For the first time during the litigation, MET raised the defense that it was not the responsible claims administrator or insurer because Mitchell's alleged disability had started in October 2003 when he was covered under the UNUM policy. MET argued that UNUM was the responsible administrator and insurer.

Mitchell next filed an administrative claim for LTD benefits with UNUM. UNUM denied Mitchell's claim because it found that he did not suffer from a disability and that the late filing of the claim prejudiced its evaluation. On appeal, UNUM additionally found that Mitchell was still working after the date of his claimed disability, rendering him ineligible for LTD benefits. Mitchell then added UNUM to this action.

After considering the written submissions and documentary evidence of the parties, and hearing oral argument, the Court adopts the following Findings of Fact and Conclusions of Law. The Court holds that MET abused its discretion in denying Mitchell's claim, and that MET is the responsible claims administrator and insurer for Mitchell's disability.

## FINDINGS OF FACT[1]

### I. *The Parties*

1. Plaintiff Michael Mitchell has been an employee of CB Richard Ellis ("CBRE") since 1983. He is currently a vice president of sales.

2. CBRE, Mitchell's employer, is a company that specializes in real estate services.

3. Defendant Metropolitan Life Insurance Company ("MET") issues insurance policies, including disability insurance coverage for employee benefit plans.

4. Defendant and cross-claimant UNUM Life Insurance Company of America ("UNUM") issues insurance policies, including disability insurance coverage for employee benefit plans. UNUM is a subsidiary of UNUMProvident Corporation.

### II. *The UNUM Disability Insurance Policy*

5. Effective January 1, 2000, UNUM issued its insurance policy ("UNUM Policy") to CBRE, providing LTD benefits for eligible employees. (UNUM 34.) UNUM was the insurer and claims administrator for the policy.

6. The relevant portion of the UNUM Policy on coverage provides:

WHEN DOES YOUR COVERAGE END? Your coverage under the policy or a plan ends on the earliest of: the date the policy or plan is cancelled ...

UNUM will provide coverage for a payable claim which occurs while you are

---

1. Unless otherwise noted, all facts come from either the MET Administrative Record ("MET") or the UNUM Administrative Record ("UNUM").

covered under the policy or plan. (UNUM 45.)

7. The UNUM POLICY defines "disability" as follows:

[Y]ou are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and

[Y]ou have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury; and

[D]uring the elimination period,[2] you are unable to perform any of the material and substantial duties of your regular occupation.

After 24 months of payments you are disabled when UNUM determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience. (UNUM 47) (emphasis omitted).

8. To be eligible for LTD benefits, the UNUM Policy requires that a beneficiary be "continuously disabled through [the] elimination period." The elimination period is 90 days. (UNUM 47).

9. The UNUM Policy requests written notice of a claim within 30 days of the starting date of disability and requires written notice within 90 days of a claimant's elimination period. UNUM allows written notice for up to a year after the elimination period when it not possible to meet the 90–day requirement. (UNUM 38.).

10. Under the Policy, UNUM was the claims administrator. The Policy provides: "When making a benefit determination under the policy UNUM has discretionary authority to determine eligibility for benefits and to interpret the terms and provisions of the policy." (UNUM 43.)

### III. *The MET Disability Insurance Policy*

11. On January 1, 2004, MET replaced UNUM as the administrator and insurer of the CBRE plan. MET issued a new insurance policy ("MET Policy") to cover the CBRE LTD benefits plan.

12. The Met Policy is comprised of a master plan document and a summary plan description.[3]

13. The MET Policy's master plan has a section entitled "Special Rules For Groups Previously Insured Under A Plan Of Disability Income Insurance." The stated purpose of the rules are "[t]o prevent a loss of insurance because of a change in insurance carriers." (MET 27.) The "Special Rules" section contains "Rules for When Insurance Takes Effect if You were insured Under the Prior Plan on the Day Before the Replacement Date." It provides in relevant part:

If You are Actively at Work on the day before the Replacement Date, You will

---

**2.** Under the UNUM policy, elimination period is "a period of continuous disability which must be satisfied before you are eligible to receive benefits from UNUM." (UNUM 66.)

**3.** The master plan sets forth the terms and conditions of an insurance policy. ERISA requires that participants and beneficiaries of an employee benefit plan receive a summary plan description that is "written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably ap-

prise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a); *Pisciotta v. Teledyne Indus.*, 91 F.3d 1326, 1329 (9th Cir.1996) ("The SPD [summary plan description] is the statutorily established means of informing participants of the terms of the plan and its benefits.") (citation omitted). The Ninth Circuit recognizes a summary plan description as part of an ERISA plan. *Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1143 (9th Cir.2002).

become insured for Disability Income Insurance under this certificate on the Replacement Date. If You are not Actively at Work on the day before the Replacement Date, You will become insured for Disability Income Insurance under this certificate on the date You return to Active Work. (MET 27.)

14. The MET master plan defines "Actively at Work" or "Active Work" to mean "You are performing all of the usual and customary duties of Your job on a Full–Time basis." (MET 20). The MET summary plan defines "Actively at Work" or "Active Work" to mean "Being on the job as required of an employee or Independent Contractor of CBRE." (MET 220.)

15. The "Special Rules" section also contains "Rules for Pre-existing Conditions" that provides:

In determining whether a Disability is due to a Pre-existing Condition, We will credit You for any time You were insured under the Prior Plan. If Your Disability is due to a Pre-existing Condition as described in this certificate, but would not have been due to a pre-existing condition under the Prior Plan, We will pay a benefit equal to the lesser of: the benefit amount under this certificate; or the disability income insurance benefit that would have been payable to you under the Prior Plan. (MET 27.)

16. The MET Policy's master plan defines "Disabled or Disability" as meaning that "[d]ue to Sickness or as a direct result of accidental injury:

You are receiving appropriate care and treatment and complying with the requirements of such treatment; and
You are unable to earn:
during the elimination period and the next 24 months of sickness or accidental injury, unable to earn more than 80% of your pre-disability earnings at your own occupation for any employer in the local economy; and

After such period, unable to earn more than 80% of your pre-disability earnings at your own occupation for any employer in your local economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, and experience." (MET 20.)

17. The MET Policy defines "disability" at two locations in the summary plan. First, under the "Plan Benefits" section, it states:

You will be considered disabled under the LTD Plan when MetLife determines that you are unable to perform your regular job functions due to sickness, or as a direct result of accidental injury, the employee is receiving appropriate care and treatment and complying with the requirements of such treatment and is:
During the elimination period and the next 24 months of sickness or accidental injury, unable to earn more than 80% of their pre-disability earnings at own occupation for any employer in the local economy;
After such period, unable to earn more than 80% of their pre-disability earnings at own occupation for any employer in the local economy at any gainful occupation for which they are reasonably qualified taking into account their training, prior education, or experience. (MET 257.)

Second, under the "Definitions" section, "disability" is defined as "a condition in which a person is unable to perform the material and substantial duties of his/her regular occupation due to illness or injury. Or, after 24 months of receiving [LTD] payments, a condition in which a person is unable, due to the same illness or injury, to perform the duties of any gainful occupation for which he or she is rea-

sonably fitted by education, training or experience." (MET 270.)

18. The MET Policy's summary plan identifies MET as the claim administrator for LTD benefits. The Policy states that MET has "exclusive, complete, and final discretionary authority to interpret and apply Plan provisions and to determine related facts with regard to:

> Determining a participant's eligibility to receive benefits
>
> Processing claims
>
> Paying benefits
>
> Making determinations on appeals of claim denials."

(MET 268.)

### IV. *Mitchell's History of Illness*

19. Michael Mitchell claims to suffer from several health problems, including but not limited to chronic fatigue syndrome ("CFS"), hemochromatosis,[4] restless leg syndrome ("RLS"),[5] knee osteoarthritis, sleep apnea, and depression.

20. In 2001, Mitchell suffered increasingly worse health problems. In February 2001, he was diagnosed with RLS. (MET 134.) In March 2001, Mitchell had a Fibromyalgia Initial Evaluation conducted by Dr. Silverman, the director of Cedars–Sinai Medical Center's fibromyalgia program. Dr. Silverman did not find fibromyalgia, but did note a history of chronic fatigue. At that time, Dr. Silverman found no significant limitation in daily activities. (MET 112, 114.)

21. In September and October 2003, Mitchell went to the Mayo Clinic Sleep Disorder Center, The Mayo Clinic specialists diagnosed Mitchell with CFS, probable major depression, RLS, and mild sleep apnea. The Mayo Clinic's re-port stated that "[t]he predominant problem is that of long-standing chronic fatigue syndrome ...." The Mayo Clinic report recommended that Mitchell undergo a multimodal treatment program for chronic fatigue. (MET 177–182.) Throughout the remainder of 2003 and 2004, Mitchell underwent treatment, visiting at least twenty doctors and specialists during that time, and taking several medications. (MET 96, 129–131, 174–176.)

22. From December 2003, Mitchell began seeing Dr. Uy, an Assistant Professor of Psychiatry with the USC Department of Psychiatry. In a September 2004 letter to a MET case manager, Dr. Uy described Mitchell's depression, and the contribution of his other physical ailments to worsening symptoms of depression. Dr. Uy concluded that Mitchell's symptoms had not improved for nearly a year and that he would probably be "unable to perform adequately at work for at least a year." (MET 96–97.)

23. In February 2004, Mitchell went to Dr. Petzinger of the USC Neurology department. Mitchell's MRI was found to be "essentially unremarkable." Dr. Petzinger commented that Mitchell's behavior "seemed a little bit off." (MET 131.) A subsequent neurophysiological evaluation of Mitchell performed by Dr. McCleary of USC Neurology "failed to highlight any impaired cognitive domains." Dr. McCleary noted that Mitchell was "experiencing a remarkably high level of emotional distress" that may be linked to his physical symptoms. (MET 134–139.) After this exam in June 2004, Dr. Petzinger re-evaluated Mitchell, finding no improvement in his symptoms. (MET 125–26.)

---

**4.** Hemochromatosis is a disorder where iron-containing pigments collect in a person's tissues, resulting in joint or abdominal pain, weakness, and fatigue.

**5.** RLS is a neurological condition that causes a person to need to move their legs frequently.

24. In August 2004, Mitchell again saw Dr. Silverman, who had become a UCLA Professor of Medicine. Dr. Silverman confirmed the diagnosis that Mitchell had CFS, major depression, RLS, hemochromatosis, and osteoarthritis of the knees. In discussing Mitchell's CFS, Dr. Silverman stated that Mitchell was "unfortunately at this point disabled in that he cannot initiate new work or clients." Dr. Silverman recommended a pain program, including aquatic exercise. He also noted Mitchell's inability to tolerate most antidepressant medications. (MET 116–121.)

25. During this time, Mitchell also visited Dr. Ehresmann, a USC medical school rheumatologist. A November 2004 letter from Dr. Ehresmann summarizes Mitchell's history of illness. Dr. Ehresmann states that "patient's work capacity is impaired due to these medical factors." (MET 91–93.)

26. Mitchell claims that these health problems were detrimental to his work performance. As Mitchell's compensation was commission-based, he suffered lost earnings. His earnings for the relevant period were as follows: (1) 2001—$163,000; (2) 2002—$239,000; (3) 2003—$19,000; (4) 2004—$17,000; (5) 2005—$48,000; (6) 2006—$114,000; (7) 2007—$100,000 (through April 2007). (Bernacchi Declaration ¶ 3, Ex. 1.)

## V. *Mitchell's Claims for LTD Benefits*

### A. *Mitchell's Claim Under the MET Policy*

27. In March 2004, three months after the MET Policy took effect, Mitchell contacted MET about filing a LTD benefits claim. In a March 17 letter, Mitchell explained that he was working Monday to Friday, 9 AM to 5 PM, but that his conditions, listed in the letter, had "deteriorated to the point that I cannot do my job effectively." (MET 244.) In a March 23 phone call with MET personnel regarding LTD

benefits, Mitchell explained that he did not plan to stop coming to work. He was informed that a continuous absence was required to qualify for LTD benefits. (MET 59.)

28. On April 15, 2004, Mitchell filed a claim with MET, arguing that his health conditions established a disability. On the claim form, Mitchell wrote that he was still working. Further, he stated that the disability began in October 2003, three months before the MET Policy began. Mitchell attached a statement regarding his conditions, an attending physician statement by Dr. Wollaston, and the Mayo Clinic Report.

29. Dr. Wollaston's statement indicated that Mitchell had hemochromatosis and osteoarthritis of the knee. He rated Mitchell as having a Class 3 psychological limitation, meaning Mitchell could handle only limited stress situations. He noted that stress could exacerbate Mitchell's fatigue and pain. Further, he advised that Mitchell only work part-time and recommended job modification. (MET 119–121.)

30. On April 23, 2004, MET denied Mitchell's claim. In its denial letter, MET provided the definition of disability from its master plan. (MET 167; *see also* MET 20.) MET determined that Mitchell did not meet its definition of disability, reasoning that Dr. Wollaston's statement did not note any work restrictions and Mitchell was in fact still working. MET found that Mitchell was not disabled because he was capable of performing his own occupation, which was a sedentary position. (MET 167.)

31. On May 13, 2004, CBRE's Human Resources department sent to Mitchell by fax a copy of "the UNUM claim form that needs to be used instead of MetLife since this began prior to January 1, 2004." (UNUM 695.) The Court concludes that "this" refers to Mitchell's complaints of a

disabling condition. The Court notes that the MET administrative record does not contain this fax.

32. After the denial, Mitchell called MET for an explanation of the denial. He was told that a person is disabled only if unable to function at less than a sedentary level of occupation due to their condition. (MET 61.) Mitchell then engaged in a series of correspondence with Teresa Barthlow, the MET senior LTD case management specialist who was the signatory to Mitchell's denial letter. (MET 159–168.) Mitchell was attempting to obtain clarification of the definition of disability under the MET Policy. Mitchell's first letter to Barthlow sought clarification of the meaning of disability in relation to his condition. Barthlow's response explained the MET appeal procedures. When Mitchell sent a second letter stating that his questions from the first letter were "unanswered," Barthlow responded as follows: "Although I do wish to be as helpful as possible with respect to your questions of the claim denial and/or appeal procedures I will not become engaged in a deliberation with you of the Policy's definition of 'Disabled or Disability.' I apologize for any lack of communication or miscommunication you may feel towards my ability to answer your questions." (MET 159.)

33. On June 27, 2004, Mitchell informed MET by telephone that he intended to appeal the decision. The phone record indicates Mitchell stated that "he could perform the job since it was sedentary, but he could not earn as much because of chronic fatigue." (MET 61.)

34. In December 2004, now represented by counsel, Mitchell appealed the decision and included additional documentation of his medical conditions. Mitchell's counsel sent a letter to MET requesting that they exercise their contractual right to conduct an independent medical examination of Mitchell to determine his eligibility for LTD benefits. MET never conducted an independent medical examination. (MET 44.)

35. MET had Dr. Schmidt, one of its physician consultants, review Mitchell's case and prepare a report. In connection with his appeal, Mitchell included the medical reports and letters from specialists that the Court has recounted under the section "Mitchell's History of Illness" above. (MET 81–147.) Mitchell provided letters from co-workers that noted the impact of his health problems on his work. (MET 148.) He also included a personal medical diary that tracked his conditions. (MET 186–226.) Dr. Schmidt reviewed these materials. At the time that she reviewed Mitchell's case, Dr. Schmidt generally worked as a physician consultant for MET three days a week. (Deposition of Dr. Schmidt 13:6–8; 14:13–18.)

36. Dr. Schmidt concluded that the "[f]ile lacks sufficient medical [sic] to support objective evidence of a physical functional capacity impairment to a full-time sedentary position." (MET 77.) On several occasions in the report. Dr. Schmidt notes that the file lacks particular information: the lack of x-rays or MRI scans of his knees or neck, or other notes on his orthopedic problems; lack of lower extremity or vascular studies to substantiate leg pain; lack of doctor recommendations that CFS indicated ADL impairments or the need for a home health aide; lack of actual reports of sleep studies. However, Dr. Schmidt notes in her report that many of these records, x-rays, and studies were available, when she specifically refers to Mitchell's treating physicians' comments on those items. As to the diagnosis of Mitchell's depression, Schmidt stated that "I am not qualified to comment." (MET 77–78.)

37. Relying primarily on Dr. Schmidt's report, MET denied Mitchell's appeal.

(MET 70–72.) In finding that Mitchell did not suffer from a disability, the appeal denial states: "The file contained no actual sleep study results or objective evidence of a functional impairment that would have prevented Mr. Mitchell from performing his own occupational job duties. The occupation of Vice President of Sales is sedentary. The definition of disability indicates that you must be able to perform your own occupation." (MET 71–72.)

38. Thereafter, Mitchell proceeded to bring this ERISA action seeking to recover LTD benefits. Nearly one year into the litigation, MET for the first time raised the defense that Mitchell did not have coverage under the MET Policy in October 2003, the time that Mitchell asserted on his claim form as the start date of disability. Because Mitchell alleged a disability beginning before MET's coverage, MET argues that UNUM would be the administrator and insurer for Mitchell's claim. MET, therefore, argues that Mitchell's claim should have been filed with UNUM. Although Mitchell disputed MET's contention, the parties agreed to stay proceedings pending UNUM's administrative review of Mitchell's claim.

### B. Mitchell's Claim Under the UNUM Policy

39. On October 3, 2005, Mitchell submitted his claim with UNUM. UNUM contacted Mitchell's counsel to explain the claim process and to obtain information, including a list of Mitchell's physicians. (UNUM 82–87; 228–230.) UNUM also contacted CBRE to obtain predisability earnings information, hours worked, and a job description. An e-mail response from CBRE personnel explained that "[Mitchell] is still working, as far as we know, but limited hours." (UNUM 89; 297.) A disability questionnaire from Mitchell to UNUM explained that his typical work day involved arrival at or around 10:00 a.m., a lunch hour at noon, a nap in the afternoon, and leaving around 4:00 or 5:00 p.m. (UNUM 313–314.)

40. In June 2006, UNUM consultant Leor Ownby, R.N., conducted a nurse review of Mitchell's case. The nurse review provided a summary of Mitchell's conditions. Ownby concluded that the documentation did not support finding a disability in October 2003 that prevented Mitchell from working. Ownby stressed that Mitchell was "working" in October 2003 and thereafter. (UNUM 614–15.)

41. Around the same time, CBRE responded to UNUM's request for information regarding Mitchell's employment. Managing Director John Hollingsworth stated that his notes indicated Mitchell began "feeling the effects of his illness back in March 2004." He also stated that Mitchell was not a part-time employee, but rather, that his "illness limited him to half the working energy of other sales agents." (UNUM 636.)

42. In July 2006, UNUM's Debra Kile, M.D. conducted a physician review. Kile indicated a "lack of consensus regarding diagnoses and etiology of symptoms and functional consequences," but found that Mitchell's "loss of earnings [was] evident in 2003." She recommended that UNUM seek additional information. (UNUM 866–872.)

43. Mitchell provided additional information. On October 3, 2006, Ownby again reviewed Mitchell's case. Ownby concluded that the records "demonstrated the claimant is somatically preoccupied with his subjective complaints of fatigue." She also stated that the records "did not delineate clearly a period where claimant is totally impaired to perform his regular job." (UNUM 1688.) On October 10, 2006, Dr. Kile again reviewed Mitchell's case. Dr. Kile found a lack of consensus and lack of sufficient evidence to establish a disability. Specifically, she noted that

the many diagnoses of fatigue did not support a lack of capacity to work; records showed only mild sleep apnea; x-ray findings indicated moderate osteoarthritis; and records did not support significant mental impairment. She also determined that Mitchell "has reportedly physically continued to go to work further supporting physical ability for at least sedentary activities." (UNUM 1699.) Both Ownby and Kile stated that review of the claim was prejudiced by its late filing. (UNUM 1688, 1700.)

44. UNUM also had a psychiatrist, Dr. Kevin Hayes, review Mitchell's case. He found that the records did not show a severe psychiatric condition. He noted that Mitchell's initial claim with MET did not list mental condition as a basis for the disability claim. Finally, he also noted prejudice due to late filing. (UNUM 1702–04.)

45. UNUM denied Mitchell's claim, finding insufficient information to support a disability and prejudice due to late filing. (UNUM 1730–36.) Mitchell appealed the decision. UNUM again conducted a nurse and physician review. Susan K. Pendleton, R.N. affirmed that records did not support restrictions or limitations from October 2003 and that the review was prejudiced. (UNUM 1791–92.) Dr. Beth Schnars, M.D. conducted an extensive analysis of the records. (UNUM 1823–31.) She concluded that Mitchell should be found to have a "[w]ork impairment from [date of disability] (after clarification of total work cessation) to 6/11/04 at which time full evaluation for significant organic pathology was excluded." (UNUM 1830.) She recommended restricting Mitchell's work to sedentary activity. She also found the records were sufficient such that re-

view did not suffer from prejudice of late filing. (UNUM 1830.)

46. UNUM conducted another psychiatric review. Dr. Malcolm Spica, P.H.D., determined that Mitchell did not have limitations from a psychiatric perspective. UNUM also had a vocational consultant conduct a vocational review to consider whether Mitchell's position was consistent with the restrictions outlined by Dr. Schnars. The consultant concluded that Mitchell's position was sedentary and thus complied with the restrictions.

47. On January 3, 2007, UNUM affirmed denial of Mitchell's claim on appeal. The letter denying the appeal cited the policy definition of disability. It noted that CBRE informed UNUM that Mitchell never stopped working and was claiming a disability based on reduced ability to earn. Thus, UNUM concluded that did not meet the definition of disability because he "continued to perform a portion of his material and substantial duties" through January 1, 2004, which was the day after termination of the UNUM policy. (UNUM 1856–59.)

## CONCLUSIONS OF LAW

### I. *Standard of Review*

 1. ERISA provides for judicial review of a decision to deny benefits to an ERISA plan beneficiary. *See* 29 U.S.C. §§ 1132(a)(1)(B); 1132(e).[6]

2. ERISA benefits determinations are to be reviewed de novo, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). An ERISA benefits determination under a plan that "unambiguously" confers such discretionary

6. MET and UNUM do not argue that they are not proper parties under 29 U.S.C. § 1132(a)(1)(B). *See Everhart v. Allmerica* *Fin. Life Ins. Co.*, 275 F.3d 751, 754 (9th Cir.2001).

authority shall be reviewed under an abuse of discretion standard. *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1090 (9th Cir.1999). In this case, both the MET Policy and UNUM Policy unambiguously confer discretion to determine eligibility for benefits and interpret plan terms.[7] Therefore, the Court reviews the MET and UNUM denials of benefits under an abuse of discretion standard.

## II. *Mitchell's Claim With MET*

### A. *MET's Conflict of Interest*

■ 3. In *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 967–69 (9th Cir.2006), the Ninth Circuit held that district courts should employ a case-by-case approach to abuse of discretion review in ERISA cases. *Id.* This approach allows district courts to consider the "kind of inherent conflict that exists when a plan administrator both administers the plan and funds it, as well as other forms of conflict." *Id.* at 967.

4. The Ninth Circuit has offered guidance on tailoring review to the particular facts and circumstances of a ERISA administrator's denial of benefits:

The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask plaintiff for necessary evidence, fails to credit claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Id.* at 968 (citations omitted).

5. Ultimately, the "district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the [ ] administrator's reason for denying insurance coverage." *Id.* As the claims administrator and insurer, MET had an "inherent conflict of interest." *Id.; see also Lang v. Long–Term Disability Plan of Sponsor Applied Remote Technology, Inc.,* 125 F.3d 794, 797 (9th Cir. 1997). Based on the facts and circumstances of MET's administrative review, the Court finds that MET's reasons for denying Mitchell's claim should be reviewed with skepticism. As will be discussed further below, the Court finds that MET applied the wrong definition of disability, *see Tremain v. Bell Industries, Inc.,* 196 F.3d 970, 977 (9th Cir.1999), failed to credit Plaintiff's substantial evidence of serious medical conditions, *see Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 830, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), and failed to adequately investigate the claim or request available evidence when the lack of that evidence in the file was part of the reason for denial, *see Booton v. Lockheed Medical Benefit Plan,* 110 F.3d 1461, 1463 (9th Cir.1997).[8] Where MET has engaged in

---

7. *See* Findings of Fact, Parts II and III, *supra.*

8. In addition, Mitchell argues that MET offered inconsistent reasons for denial of his claim, which would be another factor to be weighed in abuse of discretion analysis. *See Lang,* 125 F.3d at 798–99. In the initial denial, MET found that Mitchell was still working and that he was able to perform a sedentary position. On appeal, MET found that insuffi-

cient objective evidence of a disability preventing Mitchell from performance of a sedentary position. Although the Court does not find these reasons patently inconsistent, the Court does weigh the fact that MET has applied an objective evidence requirement that does not appear in the policy. *See infra* Conclusions of Law, Part II.C.2. This is not so much inconsistent as a procedural irregularity. *See Abatie,* 458 F.3d at 972–74. Further,

several practices indicative of a significant conflict of interest, this warrants heightened abuse of discretion review. *See Abatie*, 458 F.3d at 968.[9]

### B. MET's Conflicting Plan Definitions of Disability

 6. Federal common law principles of contract interpretation guide the interpretation of ERISA plan terms. *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997). The terms of the plan should be interpreted "in an ordinary and popular sense as would a [person] of average intelligence and experience." *Id.* (internal quotation omitted). When parties dispute the meaning of plan terms, a court should "first look to the explicit language of the agreement to determine, if possible, the clear intent of the parties." *Id.*

7. In the Findings of Fact, the Court noted that MET's master plan and summary plan description had conflicting definitions of disability. The master plan provides that a person is disabled if "[d]ue to Sickness or as a direct result of accidental injury:

> You are receiving appropriate care and treatment and complying with the requirements of such treatment; and
> You are unable to earn:
> during the elimination period and the next 24 months of sickness or accidental injury, unable to earn more than 80% of your pre-disability earnings at your own

occupation for any employer in the local economy."

The summary plan description contains a more restrictive definition of disability. In addition to the terms from the master plan, the summary plan description also requires that a person be "unable to perform his/her regular job functions due to sickness or as a direct result of injury."[10] Here, Mitchell claims he was disabled under the master plan definition. MET counters that Mitchell was not disabled under the summary plan definition.

8. The Court finds that the master plan definition of disability unambiguously did not contain a regular job functions requirement, whereas the summary plan unambiguously did. When a master plan document and summary plan description contain conflicting provisions, the Ninth Circuit has held that the provision more favorable to the employee is controlling. *Bergt*, 293 F.3d at 1145.[11] The Ninth Circuit has provided the following rationale for this principle:

> Any burden of uncertainty created by careless or inaccurate drafting of the summary must be placed on those who do the drafting, and who are most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of the summary or the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document. Accuracy is not a lot to ask.

---

that MET raises new arguments during litigation is a separate issue that the Court will address below.

**9.** While a court may consider extrinsic evidence to determine the proper level of judicial scrutiny when an administrator has a conflict of interest, *Abatie*, 458 F.3d at 970, MET has not offered extrinsic evidence to rebut the presence of factors that indicate a significant conflict of interest.

**10.** Elsewhere in the summary plan description, MET defines "disability" as "a condition in which a person is unable to perform the material and substantial duties of his/her regular occupation due to illness or injury."

**11.** As noted earlier, both the master plan document and summary plan description are part of the plan. *Bergt*, 293 F.3d at 1143.

*Id.*, quoting *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 982 (5th Cir.1991). Given the conflicting provisions in MET's master plan and summary plan,[12] the Court reviews MET's decision under the master plan's definition of disability, which is more favorable to Mitchell. *See Bergt*, 293 F.3d at 1145.[13]

## C. *MET's Denial of Mitchell's Claim*

### 1. *Mitchell's Initial Claim*

9. Although MET cited to the master plan definition in denying Mitchell's claim, (MET 167), MET simply failed to apply it to Mitchell's case. The master plan definition required only that due to sickness Mitchell 1) was receiving appropriate treatment and 2) was unable to earn 80% of his predisability earnings during the elimination period and the next 24 months. Mitchell provided evidence that he earned less than 80% of his predisability earnings and that he was receiving regular treatment for his conditions. However, MET's denial letter does not discuss these elements at all. Rather, MET determined that Mitchell was still working and capable of performing his sedentary position.

10. Due to the conflicting definitions of disability, MET had to apply the more favorable terms of the master plan. *See Bergt*, 293 F.3d at 1145 (recognizing that poor drafting, which results in conflicting terms, must be resolved against an ERISA defendant as drafter of the policy); *see*

also *Banuelos v. Constr. Laborers' Trust Funds for So. Cal.*, 382 F.3d 897, 904 (9th Cir.2004) ("Courts will generally bind ERISA defendants to the more employee-favorable of two conflicting documents-even if one is erroneous."). Instead, MET disregarded that the master plan definition of disability unambiguously did not contain a requirement that a person be able to perform regular functions. MET in fact applied the more stringent summary plan definition of disability by inquiring into Mitchell's ability to perform regular job functions, notwithstanding its citation to the master plan definition. Accordingly, MET applied the wrong definition of disability. *See Tremain*, 196 F.3d at 977 (finding the application of the wrong definition of disability was an abuse of discretion). Mitchell's interpretation that he could still work and be disabled was reasonable in light of the conflicting provisions. The Court concludes that MET's denial, based upon application of the incorrect definition of disability, was an abuse of discretion.

11. Inconsistency between master plan and summary plan documents is a recurrent problem in ERISA cases. Summary plans, which are supposed to explain employer benefit plans to employees in succinct, clear language, routinely serve to obfuscate the meaning of plan terms by having terms that conflict with the master

**12.** At oral argument, MET initially asserted that the summary plan is controlling because it is the document that explains the plan to employees. When the Court inquired whether MET maintains this position for a summary plan *materially inconsistent with the master* plan, MET then asserted that the master plan and summary plan are not inconsistent. However, MET did not explain its assertion nor identify any ambiguity in the master plan's terms. The Court's finding is supported by MET's failure to explain a basis for viewing the master plan and summary plan definitions as consistent policy terms.

**13.** The Court further notes that application of the master plan definition is appropriate since MET quoted the definition of disability from its master plan in full when it denied Mitchell's administrative claim and appeal. Although MET's trial briefs now cite to the more restrictive language from the summary plan description, the Court finds the master plan definition is controlling. Ninth Circuit authority and MET's own conduct support use of the master plan definition.

plan. The resulting confusion constitutes a disservice to the parties involved. Many employers bargain for particular policy provisions in benefit plans that they offer to employees, only to have inconsistencies blur those policy terms, often being interpreted by administrators in an ad hoc manner that restricts entitlement to benefits. When faced with two conflicting documents, employees cannot consult either for guidance, and are similarly subject to the risk that inconsistent terms will be exploited to impose greater restrictions on benefits. Steadfast adherence to a rule that resolves inconsistencies against the drafter will encourage the drafting of consistent plan documents that will better serve employers and employees alike, and avoid courts and lawyers having to needlessly determine the effect of conflicts in terms that arise from unnecessary drafting errors.

### 2. *Mitchell's Appeal and Dr. Schmidt's Report*[14]

 12. MET's denial on appeal was based primarily on Dr. Schmidt's report, which found no disability based upon a lack of objective evidence. Before even considering the report, the Court finds that MET could not deny Mitchell's claim based upon this objective evidence requirement. Nowhere in the plan terms is there an objective evidence requirement, nor does MET explain the basis for this requirement. MET cannot deny a claim based upon a lack of objective evidence unless that standard was made "clear, plain and conspicuous enough [in the Policy] to negate layman [Mitchell's] objectively reasonable expectations of coverage." *Saltarelli v. Bob Baker Group Med. Trust*

*et al.*, 35 F.3d 382, 387 (9th Cir.1994). The first mention of an objective evidence requirement in the administrative record was in MET's denial of Mitchell's appeal. MET cannot deny Mitchell's claims based on new standards not within its Policy. *See Canseco v. Constr. Laborers Pension Trust for So. Cal.*, 93 F.3d 600, 608 (9th Cir.1996) (holding that administrators "may not construe a plan so as to impose an additional requirement for eligibility that clashes with the terms of the plan").

13. MET's reliance on objective evidence is problematic for medical conditions like Mitchell's that may not be amenable to objective verification. In cases involving chronic fatigue syndrome, the Ninth Circuit has held that subjective evidence is important because "CFS does not have a generally accepted 'dipstick' test." *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1112 (9th Cir.1999); *see also Rose v. Shalala*, 34 F.3d 13, 18 (1st Cir.1994) (recognizing that a "lack of objective proof is what one may expect in cases of CFS"). MET's application of an objective evidence requirement is inconsistent with medical opinion and case law that identifies the importance of subjective factors in diagnosis and treatment of conditions like CFS.

14. Additionally, MET applied this objective evidence requirement without informing Mitchell of the kind of evidence that could satisfy it. When Mitchell's appeal was denied, MET did not provide an explanation of objective evidence. The Court finds that MET failed to comply with 29 C.F.R. 2560.503–1(g)(iii) which requires "a description of any additional material or information necessary for the claimant to perfect the claim and an expla-

---

**14.** The Court incorporates its conclusions with respect to the initial claim for MET's denial on appeal, where it also effectively applied an incorrect definition of disability. Nevertheless, the Court considers the denial on appeal and the report of MET's physician consultant, Dr. Schmidt. The Court notes that the master plan definition would have allowed MET to deny benefits if Mitchell's inability to earn was not "due to sickness." However, MET never considered Mitchell's claim in this regard.

nation of why such material or information is necessary." The Ninth Circuit has described this regulation as encouraging "meaningful dialogue between ERISA plan administrator and their beneficiaries." *Booton,* 110 F.3d at 1463. Instead, MET opted to find a lack of objective evidence without explanation how Mitchell might meet the requirement. *Cf. Boyd v. Aetna,* 438 F.Supp.2d 1134, 1154 (C.D.Cal.2006) (finding a significant procedural irregularity when a plan repeatedly informed claimant that there was "no objective evidence" without ever specifying what evidence would support a claim, albeit before *Abatie*).

15. Accordingly, the Court finds MET's application of an objective evidence requirement—written nowhere in its policy, inconsistent with evaluation of conditions like CFS, and without explanation of what evidence Mitchell could have provided to satisfy the requirement—to itself constitute an abuse of discretion.

16. Given the problems with requiring objective evidence in this case, the Court finds that Dr. Schmidt's report failed to credit Plaintiff's substantial evidence of serious medical conditions. *See Nord,* 538 U.S. at 834, 123 S.Ct. 1965.[15] As discussed in the Findings of Fact, Mitchell's conditions were confirmed by the diagnoses of several treating physicians. These physicians offered the opinion that Mitchell was restricted in his ability to work due to those conditions. Although Dr. Schmidt was not bound to find a disability based on these opinions, Dr. Schmidt was required to accord some weight to those opinions in reaching a decision. *See id.* at 834, 123 S.Ct. 1965. Since she reviewed Mitchell's evidence un-

der an unwritten and unexplained objective evidence requirement for a condition not amenable to objective verification. Dr. Schmidt imposed an improper standard of review on Mitchell's evidence, and as a result, his claimed disability.

17. This may explain why Dr. Schmidt's report concentrates on questioning much of Mitchell's evidence. Dr. Schmidt attributed a lack of objective evidence, in part, to the lack of documentation of particular tests. Yet Dr. Schmidt's report admits the existence of many of those tests in discussing the comments of treating physicians on those very tests. (MET 73–79.) The administrative record does not show that MET requested this available documentation prior to rejection of Mitchell's claim. However, an ERISA plan "shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant: ... (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary...." 29 C.F.R. § 2560.503–1(f); *see also Booton,* 110 F.3d at 1463. The Ninth Circuit has made clear that an administrator cannot base denial of a claim on a lack of information when it fails to request available information from the employee. *See id.* at 1464. However, MET never inquired into the availability of the records or the tests, that it suggested would be useful evidence in its denial of Mitchell's claim.

18. Where MET had before it substantial, reliable evidence indicating the existence of a disability, it could not rely sim-

---

15. The Court notes Plaintiff's arguments that Dr. Schmidt was unqualified and herself a conflicted consultant, as opposed to an independent reviewer of Mitchell's claim. That Dr. Schmidt worked for MET three days per

week as a reviewer does suggest some degree of a conflict of interest and the Court has appropriately weighed that factor in tailoring its abuse of discretion review. (*See* Deposition of Dr. Schmidt 13:6–8; 14:13–18.).

ply on a lack of evidence to deny Mitchell's claim. This is not a case where an administrator credited other reliable evidence over a claimant's treating physicians. The circumstances suggest that MET, a conflicted administrator, affirmatively sought to avoid obtaining additional evidence that could support a claim, perhaps in the interest of denying the claim for lack of evidence. This was an occasion when an independent medical examination was in order to determine the credibility of Mitchell's evidence.[16] MET did not exercise this option, choosing instead to assert a lack of evidence without attempting to confirm for itself whether Mitchell suffered from disabling conditions.

### 3. MET's Determination That Mitchell Did Not Have a Disability Was an Abuse of Discretion.

19. As a result of the serious problems with MET's adjudication of Mitchell's administrative claim, MET never determined whether Mitchell had a disability under the master plan definition of disability. The master plan definition required only that due to sickness Mitchell 1) was receiving appropriate treatment and 2) was unable to earn 80% of his predisability earnings during the elimination period and the next 24 months. Mitchell provided substantial evidence that his medical conditions impaired his capacity to work. Mitchell also showed that he earned less than 80% of his predisability earnings and that he was receiving regular treatment for his conditions. MET did not otherwise dispute that Mitchell was under "appropriate care" or that Mitchell was unable to earn more than 80% of predisability earnings. MET did not provide evidence that Mitchell's reduced earnings was due to a cause other than his medical conditions.

Accordingly, under MET's master plan definition of disability, the Court finds that Mitchell had a disability. Therefore, the Court holds that MET abused its discretion in denying Mitchell's claim.

20. Nevertheless, the Court notes that MET's denial of benefits, based at least in part on the fact that Mitchell was "still working," is in tension with its argument that Mitchell needed to be unable to perform regular job functions. The fact that a person is "still working" does not settle whether that person is able to perform regular job functions. *See, e.g., Hawkins v. First Union Corp. Long–Term Disability Plan,* 326 F.3d 914, 918 (7th Cir.2003). Here, while Mitchell attended work on a full-time basis, substantial evidence indicates that he was unable to perform regular job functions. That MET appears to have equated being at work with being able to perform regular job functions indicates its flawed approach to evaluating Mitchell's claim. Mitchell's physicians and supervisor attested to the significant work impairment associated with his medical conditions. MET's reliance on Mitchell's continued attendance at work, as well as the noted problems with the objective evidence requirement, do not satisfy the Court that MET properly considered whether Mitchell was able to perform regular job functions. Accordingly, even under the more stringent policy definition of disability, the Court holds that MET abused its discretion by denying that Mitchell was disabled.

21. In this case, MET had to use the controlling master plan definition of disability, but applied more stringent requirements from a conflicting summary plan definition. MET additionally applied an unwritten and unexplained objective evi-

---

**16.** The Court also notes that Dr. Schmidt concedes that she was not qualified to determine the disabling nature of at least some of Mitch-

ell's conditions. (MET 77–78) (stating "I am not qualified to comment" with respect to Mitchell's depression).

dence requirement. As a result, MET failed to credit Mitchell's reliable evidence. Under the MET policy, the Court finds that Mitchell had a disability. Therefore, the Court holds that MET abused its discretion in denying Mitchell's disability claim.

### D. *MET Is The Responsible Administrator and Insurer*

■ 22. Having determined that MET abused its discretion in denying Mitchell's disability claim, the only remaining question is whether MET is responsible as administrator and insurer for Mitchell's claim. This issue arises due to the change in coverage from UNUM to MET on January 1, 2004. MET has argued for the first time in this litigation that Mitchell has no claim because he was not covered by MET in October 2003, the claimed start date of disability. During administrative review, MET never offered this reason as a basis for denial of Mitchell's claim.

23. MET may not disavow that it was the administrator and insurer for Mitchell's claim when it never raised that reason during administrative review.[17] ERISA requires an administrator to set forth the specific reasons for denial of benefits. 29 U.S.C. 1133; 29 C.F.R. 2560.503–1. When doing so, an administrator must support the reasons for denial "with specific reference to the plan provisions that form the basis for the denial." *Booton*, 110 F.3d at 1463. The Ninth Circuit has explained that district courts are limited to review of the reasons for denial asserted during the administrative process to prevent an administrator from sandbagging an employee "by a rationale the plan administrator ad-

duces only after the suit has commenced." *Jebian v. Hewlett–Packard Co. Employee Benefits Org. Income Protection Plan*, 349 F.3d 1098, 1104–05 (9th Cir.2003).

24. The Court adheres to the principle that an administrator's decision may be upheld, if at all, based upon the reasons provided during adjudication of the administrative claim. To hold otherwise would eschew the ERISA policy that employee beneficiaries be candidly and clearly informed of the reasons that disability benefits are being denied, 29 U.S.C. 1133(1), and receive a "full and fair review" of their claim, 29 U.S.C. 1133(2). MET was certainly aware of the change in coverage and Mitchell's claimed beginning of disability.[18] However, during administrative review, MET never offered lack of coverage as a reason for denying Mitchell benefits. The Court, therefore, finds that MET has waived any argument that it is not the responsible administrator and insurer of Mitchell's claim. Mitchell is entitled to LTD benefits from MET.

### CONCLUSION

For the foregoing reasons, the Court finds that MET abused its discretion in administrative review of Mitchell's claim. MET abused its discretion in finding that Mitchell did not have a disability under the master plan definition of disability. Finally, the Court finds that MET waived its lack of coverage defense by not raising that reason during administrative review. Thus, the Court need not review Mitchell's administrative claim with UNUM.

---

**17.** The Court rejects MET's argument that Mitchell's disability was a pre-existing condition for the same reason; Met never raised the argument in denial of Mitchell's claim.

**18.** The Court does not consider the fact that CBRE provided Mitchell with an UNUM

claim form, subsequent to filing his disability claim, to have any bearing on the specific reasons MET offered for denying Mitchell's claim. Whether MET's argument has any basis is of no moment; MET never offered lack of coverage as a reason for denial.

The Court remands for purposes of a calculation of benefits in accordance with this order. Mitchell is entitled to LTD benefits under the MET policy for the 24-month period from October 2003 to September 2005, during which he was under regular medical care and experienced the requisite loss of earnings due to sickness.[19]

IT IS SO ORDERED.

**19.** The Court does not consider whether Mitchell is entitled to any benefits beyond 24 months. The parties did not direct any arguments to the continuation of LTD benefits after 24 months, which is governed by different requirements than LTD benefits for an initial 24–month period. (*See* MET 20) (requiring after 24 months that a person be "unable to earn more than 80% of your pre-disability earnings at your own occupation for any employer in your local economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, and experience").